# UNITED STATES *v.* SOUTH BUFFALO RAILWAY CO. ET AL.

No. 198.   Argued February 2, 1948.—Decided April 26, 1948.

*Solicitor General Perlman* argued the cause for the United States.  With him on the brief were *Assistant Attorney General Sonnett, Robert G. Seaks* and *Robert W. Ginnane.*

*Bruce Bromley* argued the cause and filed a brief for appellees.

*C. A. Miller* and *Wm. J. Kane* filed a brief for the American Short Line Railroad Association, as *amicus curiae,* urging affirmance.

MR. JUSTICE JACKSON delivered the opinion of the Court.

The Government, by direct appeal from the District Court,[1] invites us to reconsider and overrule the interpretation of the commodities clause of the Interstate Commerce Act[2] promulgated in *United States* v. *Elgin, Joliet & Eastern R. Co.,* 298 U. S. 492. That holding, in substance, is that the prohibition[3] against a railroad company transporting any commodity which it owns or in which it has an interest, except for its own use, does not prevent it from transporting commodities of a corporation whose stock is wholly owned by a holding company which also owns all of the stock of the railway, unless the control of the railway is so exercised as to make it the *alter ego* of the holding company.

The present challenge to that doctrine is predicated on the following facts: Bethlehem Steel Corporation (the

---

[1] 49 U. S. C. § 45; 28 U. S. C. § 345.

[2] 49 U. S. C. § 1 (8).

[3] The complete text of the commodities clause provides: "From and after May first, nineteen hundred and eight, it shall be unlawful for any railroad company to transport from any State, Territory, or the District of Columbia, to any other State, Territory, or the District of Columbia, or to any foreign country, any article or commodity, other than timber and the manufactured products thereof, manufactured, mined, or produced by it, or under its authority, or which it may own in whole or in part, or in which it may have any interest, direct or indirect, except such articles or commodities as may be necessary and intended for its use in the conduct of its business as a common carrier."

holding company) owns substantially all of the stocks of South Buffalo Railway Company (South Buffalo) and of Bethlehem Steel Company (the Steel Company). At its Lackawanna plant, near Buffalo, N. Y., the Steel Company produces steel and from it fabricates various products. These commodities are transported by the South Buffalo from the plant to the rails of trunk-line carriers. In fact, South Buffalo provides the sole terminal connection between this industry and the trunk-line railroads. It operates about 6 miles of main-line track and 81 miles of spur track, 58 miles of its trackage being on leased right-of-way within the steel plant where it connects with other trackage owned by the Steel Company itself.

While about 70% of South Buffalo revenues have been derived from the Steel Company traffic, it also renders terminal switching for 27 unrelated industries, some of considerable size. It enables all of them to ship, by direct connection, over five trunk-line systems and through interchange over seven more.

South Buffalo performs no transportation service and owns no facilities outside of the State of New York, where it operates only within the Buffalo switching district. It is classified by the Interstate Commerce Commission as an "S–1" carrier, which is defined as one engaged in "performing switching services only." It files tariffs covering switching service, both with the Interstate Commerce Commission and with the New York Public Service Commission. It does not appear to participate with any line-haul railroad in a through interstate route or to receive a division of any joint or through rate.

In 1936 this Court decided *United States* v. *Elgin, Joliet & Eastern R. Co.,* 298 U. S. 492, and held that the production and transportation set-up of the United States Steel Corporation, one of Bethlehem's competitors, did not violate the commodities clause. Thereupon, Beth-

lehem made a study of the relations between itself, South Buffalo and the Steel Company in the light of this decision. It revised its intercorporate relationship in the next few years to comply, as it was advised, with the conditions under which this Court had found the statute inapplicable to United States Steel. It does not seem necessary to recite the complex details of intercorporate dealings before the reorganization about 1940 as this action for injunction was not begun until 1943 and the crucial question is whether there was a contemporaneous violation or a threat of violation against which the writ of the Court should be directed. Voluntarily abandoned courses of conduct are not grounds for injunction, though they may sometimes be relevant evidence of intent or similar issues.

At all times crucial to the Government's case, Bethlehem controlled the stock of both the shipper and the carrier corporations. It unquestionably had power to favor its shipping subsidiary at the expense of its carrying subsidiary, or vice versa. The first question is whether we will now hold that mere possession of the power, regardless of whether it is exercised or remains dormant, makes out a violation of the statute. This Court said in the *Elgin* case that it does not.

It is the Government's contention that the *Elgin* decision misconstrued the Act, misunderstood its legislative history and misapplied the Court's own prior decisions. It is not necessary in the view we take of the case to decide to what extent, if any, these contentions are correct. It is enough to say that if the *Elgin* case were before us as a case of first impression, its doctrine might not now be approved. But we do not write on a clean slate. What the Court has written before is but one of a series of events, which convinces us that its overruling or modification should be left to Congress. As the Court held on our last decision day, when the questions are

of statutory construction, not of constitutional import, Congress can rectify our mistake, if such it was, or change its policy at any time, and in these circumstances reversal is not readily to be made. *Massachusetts* v. *United States,* 333 U. S. 611, decided April 19, 1948. Moreover, in this case, unlike the cited one, Congress has considered the alleged mistake and decided not to change it.

The Interstate Commerce Commission, after repeatedly calling the attention of Congress to the *Elgin* case during its pendency, in 1936 reported its defeat in the litigation. Referring to commodities clause cases it said, "We recommend that Congress, in the light of facts already made available in our reports and in reports of investigations conducted by congressional committees, shall determine the appropriate limit of our jurisdiction in such cases and whether further legislation to extend that jurisdiction is necessary." [4] Congress took no action.

But its inaction has not been from inadvertence or failure to appreciate the effect of the Court's interpretation. A bill was introduced in the Senate containing language relating to affiliates and subsidiaries calculated in effect to set aside the *Elgin* decision.[5] Section 12 of the bill as introduced read as follows:

"It shall be unlawful for any carrier by railroad *and, on and after January 1, 1941, it shall be unlawful for any carrier, other than a carrier by air,* to transport, in commerce subject to this Act, any article or commodity, other than timber and the manufactured products thereof, manufactured, mined, or produced by or under the authority of such carrier *or any subsidiary, affiliate, or controlling person of such carrier,* or any such article or commodity in

[4] 50th Annual Report I. C. C. 30 (1936).

[5] S. 2009, 76th Cong., 1st Sess., March 30 (legislative day March 28) 1939.

which such carrier, *subsidiary, affiliate, or controlling person* has any interest, direct or indirect, *legal or equitable,* except such articles or commodities as may be necessary or intended for use in the conduct of the carrier business of such carrier."

The italicized portions indicate the proposed additions which would have extended the clause to cover (1) carriers other than railroads, and (2) subsidiaries, affiliates and controlling persons.

At the beginning of hearings thereon by the Senate Committee on Interstate Commerce its chairman said that, with respect to the commodities clause, the purpose of the Bill was "To make effective the intent of Congress in prohibiting railroads, or other carriers after January 1, 1941, from transporting products not utilized in the conduct of their transportation business but in which they have an interest, direct or indirect." [6] A week later, in the course of the hearings when evidence began to be offered showing the effect the proposed clause might have on various industries, the chairman made this statement:

"Let me say this to you with reference to the commodities clause, so that there will not be a lot of time wasted on it. I am speaking for myself and not for the committee. I think the commodities clause will have to be changed; and if we are going to make such drastic changes in the commodity clause as this bill would suggest, I think it ought not to be incorporated in this particular piece of legislation, but should come up as a separate piece of legislation so that we can devote considerable time and thought to that particular subject. This would so change the economic structure of a lot of industries that I

---

[6] Hearings before Senate Committee on Interstate Commerce on S. 2009, 76th Cong., 1st Sess., 3 (April 3, 1939).

think it is something that would have to have particular consideration in a separate piece of legislation." [7]

In a further discussion the Chairman added: "I might say, also, that if the commodities clause should stay in as it is at the present time it would disrupt a great many industries, and I would seriously question as to whether or not I wanted to attempt anything of that kind at this time, particularly in this specific piece of legislation." [8]

When the bill was reported to the Senate, the proposed change had been eliminated and the original language of the Act retained. The Committee, in reporting the bill, said, "The rewritten commodities clause was considered far too drastic and the subcommittee early decided against any change therein." [9]

The Government argues that the characterization of the rejected revised commodities clause as "too drastic" was based on the proposed extension of its terms to all common carriers and not on the proposal to include a "subsidiary, affiliate, or controlling person" of a carrier. We believe, however, that a fair reading of the legislative history leads to the conclusion that the "drastic readjustment" feared by the Committee was that expected from the application sought here by the Government, at least as much as that feared from extension of the clause to cover carriers other than railroads. If the Committee objected only to extending the clause to other carriers, it would have been a simple matter to delete the short series of words which would have accomplished that change, and still leave undisturbed the more complicated provision concerning subsidiaries and affiliates, since the text of each provision is wholly disconnected from the other.

---

[7] *Id.*, at 427 (April 10, 1939).

[8] *Ibid.*

[9] Senate Report No. 433, 76th Cong., 1st Sess., 15 (May 16, legislative day May 8, 1939).

In view of the foregoing, it seems clear that when, in discussing whether or not this revised clause would have "prevented the steel company, or somebody in that position, from operating their own railroad," the Committee Chairman said "I did not intend such a result," he expressed the view which prevailed in the Committee and in the Congress.

The Government now asks us to apply the unchanged language as if Congress had adopted the proposal which it rejected as "far too drastic." The considerations which led to the suggestion that the problem presented by the Government's position would require separate legislation and particular consideration seems to us to require that the problem be left to legislation rather than to the judicial process. And the pertinent portions of the legislative history which are set out at length in the margin [10] indi-

---

[10] The extent of the consideration which the Senate Interstate Commerce Committee gave to the proposed revision of the commodities clause is indicated by the following excerpts from Hearings on S. 2009, held from April 3 to April 14, 1939:

In opening the hearing, Senator Wheeler, Chairman, stated that, with respect to the commodities clause, the purpose of the bill was "to make effective the intent of Congress in prohibiting railroads, or other carriers after January 1, 1941, from transporting products not utilized in the conduct of their transportation business but in which they have an interest, direct or indirect."

During the testimony of the General Counsel, Association of American Railroads, the following colloquies took place:

"Senator Reed. Judge, in section 12 there is some new language. I have marked it 'O. K.' here. That is to cover the decisions of the Supreme Court in the *E. J. & E. case?*

Mr. Fletcher. I will get to that in just a moment. There is new language in there. . . .

. . . . .

Mr. Fletcher. I come to section 12, the commodities clause, about which I would like to say a word.

It was the thought of those who drew the bill, H. R. 4862, to undertake to put into statutory form the recommendation of the Committee of Six that they ought to extend the commodities clause,

cate clearly, we think, that this Senate Committee responsible for S. 2009, which became the Transportation Act of 1940, deliberately refused to recommend and the Con-

which now applies only to railroads, to water carriers and motor carriers as well.

Now, I think the water carrier people will object to that . . . .

. . . I think some of the steel companies have water operations of that kind. I mention that as a change in the law suggested by the draftsmen who prepared the bill, reflecting the views of the Committee of Six.

The Chairman. Judge, somebody called me on the phone the other day . . . and asked me as to whether or not in my opinion this prevented the steel company, or somebody in that position, from operating their own railroad, where they have a small railroad that they are operating. *I did not intend such a result.* [Emphasis supplied.]

Mr. Fletcher. This bill has no relation to that. One of my associates suggests, Senator, that possibly this language, which I was just about to mention and which was called to my attention a few minutes ago by Senator Reed, might possibly have that effect.

Senator Reed. *I would disagree with the chairman,* if I may be so bold. *I think the commodities clause would have that effect in the bill that we are currently discussing.* [Emphasis supplied.]

Mr. Fletcher. When I said so promptly and perhaps rashly that I did not think it did, I did not have in mind this particular amendment, which I will now mention.

Senator Reed. *I am perfectly willing that it should have that effect.*

The Chairman. *Well, I doubt that it should.* For instance, a lumber company may own some railroad.

Senator Reed. You exempt that?

Mr. Fletcher. You exempt the lumber company?

The Chairman. Yes.

Mr. Fletcher. It might not be altogether lumber.

The Chairman. *I was speaking, for instance, of some steel company or some other industrial company which might own a short railroad.* [Emphasis supplied.]

Senator Reed. The United States Steel Co. owns the Union Railroad Co.

The Chairman. I do not know what the Union Railroad Co. is.

Senator Reed. It is a short road.

Mr. Fletcher. I think the E. J. & E. started all this shouting.

Senator Reed. In section 12, on page 44, beginning at line 22, it

gress refused to legislate into the law the change we are now asked to make by judicial decision.

We could, of course, refuse to follow the *Elgin* precedent, and apply a different and more drastic rule to Bethlehem than applies to its competitor. Congress,

---

reads: 'or produced by or under the authority of such carrier or any subsidiary, affiliate'—and this is the language—'or controlling person of such carrier.'

Mr. Fletcher. That is new, you see.

Senator Reed. That is new. I am in accord with the chairman on that language.

Mr. Fletcher. I do not know, Mr. Chairman, but I do think it is a trifle unfortunate to try to accomplish so drastic a thing in a bill of this kind, the thought of which was to reproduce existing law.

The Chairman. *I am very doubtful about it. I am afraid that it will cause such a drastic readjustment.* [Emphasis supplied.]

Mr. Fletcher. The E. J. & E. Co. [case]——

The Chairman (interposing). I am not familiar with the E. J. & E. case.

Mr. Fletcher (continuing).—brought about this suggestion here. There the United States Steel Corporation does not own the E. J. & E. directly, but through the medium of the Illinois Steel Corporation, a subsidiary of the United States Steel Co.—and I may get that a little confused——

Senator Reed (interposing). You have.

Mr. Fletcher. My recollection is that the United States Steel Corporation owns a company—you might call it a holding company— which holding company owns both the E. J. & E. and the steel corporation.

It was contended by the Government that when the E. J. & E. transported freight for the Illinois Steel Corporation they were violating the commodities clause, because either directly or indirectly the railroad owned this traffic that was being transported, but the Supreme Court of the United States held not, but where you had one company or person who owned both the railroad and the commercial enterprises that produced the tonnage, the transportation by the railroad of that tonnage was not equivalent to the transportation by the railroad of tonnage which it owned.

Senator Reed. Judge, you remember that Justice Stone, Justice

however, in making a rule for the future, can make one of impartial application to all like situations. Limitations that are traditional upon our powers do seem not to permit us to do so.

Brandeis, and Justice Cardozo dissented from that majority opinion of the Supreme Court in the *E. J. & E. case.*

Mr. Fletcher. That is right.

Senator Reed. And Justice Stone wrote the dissenting opinion.

Mr. Fletcher. Yes.

Senator Reed. I am inclined to think that the Supreme [*sic*], as presently constituted, would hold with what was the minority view.

Mr. Fletcher. I would not express any opinion on that.

Senator Reed. I speak frankly, being no lawyer myself.

Mr. Fletcher. Whether that is wise or unwise, I doubt if it ought to be done in this legislation and in this bill.

Senator Reed. I thought Justice Stone wrote a more logical opinion that Justice Butler did. I think it was Justice Butler who wrote the majority opinion in that *E. J. & E. case.*

Mr. Fletcher. I think it was." [Justice McReynolds wrote the opinion of the Court.]

Later, during the testimony of counsel for Mississippi River System Carriers' Association, the following statements concerning the commodities clause were made:

"Senator Reed. . . . and I think we might give further consideration to that commodities clause.

Mr. Bayless. It is too drastic, also.

Senator Reed. It was probably tightened up when, which I say as a layman and therefore not in fear of being criticized, the Supreme Court of the United States made a strange decision in the *E. J. & E. case.* This was tightened to meet that E. J. & E. decision, because I think that was a strange construction of the law on the part of the Supreme Court of the United States."

Testimony by counsel for coal operators led to the following:

"Senator White. What changes have been made in the commodities clause?

Mr. Norman. Very substantial ones.

The Chairman. Very substantial.

Mr. Norman. That is on page 44.

The Chairman. What we tried to do, to be frank with you, was

Whatever may be said of the *Elgin* decision, when the Committee of Congress faced the readjustments its overruling would force, and with special reference to the steel

---

to try to adapt it to meet the decision of the Supreme Court in the *E. J. & E. case.*

Senator Reed. I think, of course, what Mr. Norman has in mind is that it goes further than that, in that for the first time we are applying the commodities clause to water carriers.

Senator White. I understood that, but in what other respects?

Senator Reed. I think that is the only respect.

Mr. Norman. Well, no; as the Senator says, it probably would get around the Supreme Court decision in the *E. J. & E. case*, because it puts in there the words 'subsidiary, affiliate, or controlling person of such carrier.'

The Chairman. That is right."

A discussion of the effect on coal-industry contract carriers followed. Then:

"Mr. Norman. So that commodities clause, again, is a big one and certainly ought to be studied before there are any changes made in it. It is loaded with dynamite so far as business is concerned.

Senator Reed. You may have one kind in mind, but there are many of them.

The Chairman. There are difficulties on that question, in my mind. Suppose we reenacted the law as it is. The question is whether the courts might say, in view of the Supreme Court's decision, 'In reenacting the law you approved the decision of the Supreme Court.' "

On April 10, 1939, the Chairman, in addition to the statements quoted in the body of this opinion also said:

". . . I want to say that I think it is foolish for a lot of people to come in here and waste our time and their own time in talking about that [the commodities clause], and for that reason I wanted to make it clear by that statement. . . .

"As I said before, this is such a broad subject and it would undoubtedly cause a tremendous upset in many lines of business, that it is questionable whether we would want to make such a radical departure from the present system."

As pointed out in the text, when the Bill was reported to the Senate, the proposed changes in the commodities clause had been abandoned. The Committee report stated:

". . . The commodities clause, forbidding a carrier by railroad to transport any article or commodity in which it has an interest

industry,[11] it concluded the decision should be allowed, at least for the present, to stand. We cannot ignore the considerations they found to be so persuasive, and which are equally involved in the request that we do what Congress considered and abandoned.

The relief asked of us as a court of equity is so drastic in nature as to afford an example of an "upset" in an industry owning a short line of railroad of the type referred to by the Chairman of the Interstate Commerce Committee of the Senate, who said "it is questionable whether we would want to make such a radical departure from the present system." The demand is for an injunction perpetually to enjoin and restrain South Buffalo from transporting commodities in which the Steel Company or the holding company owns an interest. There is no other rail route by which inbound raw materials or outbound products of this huge industry can reach trunk-line railroads. And the traffic that we are asked thus to prohibit yields 70% of the railroad's revenues, and if taken away would doubtless substantially increase the cost of service to the unaffiliated industries that would remain to be served. Of course, what is literally asked is probably not what is ultimately desired. To forbid the physical operation as now conducted would be needlessly damaging to both shipper and carrier. What is aimed at, we suppose, is to force such a change of financial structure as will divorce shipper interest from all transportation interest. It seems clear, however, in the light of the legislative his-

direct or indirect, with certain exceptions not very material [timber and timber products], has been retained. . . ."

"Section 12. Commodities Clause. This provision retains the 'commodities clause' (sec. 1 (8) of Interstate Commerce Act), now applicable only to railroads, in its present form. The rewritten commodities clause was considered far too drastic and the subcommittee early decided against any change therein."

[11] See note 10.

tory, that this is the kind of operation that Congress did not want to prohibit because the prohibition was thought too drastic. If an independent ownership could be found for South Buffalo, it might be desirable. But independent ownership of a dependent facility wedged in between shippers, one of whom controls 70% of its revenues, and the trunk-line railroads, is not shown to be likely. Under the Government's theory, no other shipper or group of shippers any more than Bethlehem could own the road. Nor is it clear that any evils exist or are threatened which would be eliminated if this operation were transferred to control of one of the trunk-line railroads or to a pool of them. This road, despite its shipper ownership, is bound by both federal and state law to serve all shippers without discriminations or unreasonable charges. The Commission has power to exact compliance with these duties. The argument, however, is that a situation exists which presents opportunity and temptation for abuse and for concealed evasions of duty. But to forestall possible abuses we are asked to apply a remedy which there is indication failed of congressional approval because its application to many situations would be too drastic and would do greater injury to shipper and transportation interests than could result from its withholding. In the light of the history of this clause since the *Elgin* decision and the equitable considerations involved in this case, we decline to overrule the interpretation Congress has not seen fit to set aside.

The argument is made that even accepting the *Elgin* decision the evidence here establishes that Bethlehem has so exercised its power over South Buffalo as to reduce the railroad to a mere department of Bethlehem. The trial court found against the Government and considered that on this subject this case contains much less proof to sustain an injunction than did the *Elgin* case. Without reciting the voluminous evidence in detail, we agree.

Bethlehem, as a stockholder, of course controlled South Buffalo. It did not, however, disregard in either the legal or economic sense, the separate entity of its subsidiary or treat it as its own *alter ego*. On the contrary, it rather ostentatiously maintained the formalities of separate existence, choosing as directors several Buffalo citizens who were not interested in Bethlehem. We are not naive enough to believe that Bethlehem chose men for the posts whose interests or records left any fair probability that they would act adversely to Bethlehem in representing its interest as chief stockholder of the railroad. Nor has any instance been cited in which the best interests of the railroad would require them to do so. So long as Congress considers it inadvisable to extend the prohibition of the commodities clause to subsidiaries and affiliates, we see nothing that Bethlehem has done to incur liability for its violation. Of course, it could not expect the Commission or the courts to respect a corporate entity which Bethlehem itself disregarded; but that it has not done. The subsidiary would not have to establish its separate identity by a course of hostility to its sole stockholder or its chief customer. Its identity has been preserved in form and in substance—the substance of separate corporate existence being itself largely a matter of form. Under the *Elgin* case and until Congress shall otherwise decide, this is sufficient.

*Judgment affirmed.*

Mr. Justice Rutledge, with whom Mr. Justice Black, Mr. Justice Douglas, and Mr. Justice Murphy join, dissenting.

This is another case where the Court saddles Congress with the load of correcting its own emasculation of a statute, by drawing from Congress' failure explicitly to overrule it the unjustified inference that Congress ap-

proves the mistake. I think that *United States* v. *Elgin, Joliet and Eastern R. Co.,* 298 U. S. 492, was decided in the teeth of the commodities clause, 49 U. S. C. § 1 (8), that it should now be overruled, and that this conclusion is dictated by the legislative history which the Court misreads, in my opinion, as giving basis for the opposite one.

The commodities clause forbids "any railroad company to transport . . . any article or commodity . . . in which it may have any interest, direct or indirect . . . ." The *Elgin* decision made the clause "in which it may have any interest, direct or indirect" read, in effect, "in which it may have any interest, direct or indirect, unless the interest is indirectly held through 100 per cent stock ownership of another corporation and hence 100 per cent interest in that company's profits, or through some other corporate arrangement having like effects."

The simple question for decision under the statute is whether the South Buffalo Railway has an interest, "direct or indirect," in the commodities which it hauls for the affiliated Bethlehem Steel Company. Any attempt to answer by a factual inquiry into the degree of control which the Holding Company or the Steel Company has actually exercised over the railroad can only complicate a simple problem.[1] Only by the most sophisticated, or unsophisticated, process of reasoning can it be concluded that any one of the many subsidiary members of this integrated steel-producing empire [2] has no interest in the

---

[1] See Comment, The Commodities Clause and the Regulation of Industrial Railroads, 46 Yale L. J. 299; 36 Col. L. Rev. 1175.

[2] The Holding Company owns substantially all the stock in approximately 57 subsidiaries, including the Steel Company and the South Buffalo Railway Company. Some of these produce ore in Chile, Venezuela, Cuba and in the Upper Great Lakes regions; others control coal mines in West Virginia and Pennsylvania. Two subsidiaries operate ocean-going steamship lines, hauling raw materials

operations of every other member. Particularly, the railroad has an interest in the production of the Steel Company, "for all of the profits realized from the operations of the two must find their way ultimately into its [the Holding Company] treasury,—any discriminating practice which would harm the general shipper [3] would profit the Holding Company." *United States* v. *Reading Co.*, 253 U. S. 26, 61. Here a railroad and one of its customers are both wholly owned subsidiaries of the same holding company. It is clear to me, and the Court does not deny, that the railroad in fact is occupying the inconsistent positions of carrier and shipper which the commodities clause was designed to prevent. *United States* v. *Reading Co., supra.*[4]

The Court does not dispute that it would so hold if the clause had not been construed differently in the *Elgin* case. But even on the assumption that the statute was then misconstrued, the Court is unwilling to correct its own error because it concludes that Congress has subsequently indicated approval of the *Elgin* decision. This

---

to steel plants controlled by other subsidiaries. A Great Lakes shipping company owned by the Holding Company carries ore from a mining subsidiary to a producing subsidiary. Seven short-line railroads including South Buffalo, each wholly owned by the Holding Company and having common officers and directors, transport products for the various Bethlehem steel plants.

[3] The opinion of the Court seems to assume that the purpose of the commodities clause was to prevent the holding company from favoring "its shipping subsidiary at the expense of its carrying subsidiary, or vice versa."

[4] Moreover, the conclusion is factually justified by the history of complete domination prior to 1940 plus the fact that former employees of the Steel Company continue to be the principal officers of South Buffalo as well as the other Bethlehem short-line railroads. "Historical ties and associations, combined with strategic holdings of stock, can on occasion serve as a potent substitute for the more obvious modes of control." *North American Co.* v. *S. E. C.*, 327 U. S. 686, 693.

conclusion is based on a distorted view of the legislative history of the Transportation Act of 1940, particularly of § 12 of S. 2009, which would have amended the commodities clause if adopted. Since the proposed § 12 would have overruled the *Elgin* case, and since it was rejected in committee as "far too drastic," [5] it is inferred that Congress has expressed approval of that case.

The conclusion does not follow because the premise is wrong. The argument overlooks the crucial inquiry, namely, the reason for which Congress considered the proposed § 12 "far too drastic." If this reason had been an objection to applying the commodities clause to the wholly owned subsidiary relationships present in this and the *Elgin* cases, the argument might have some pertinence. But that was not the reason. On the contrary, the two Senators who were most active in sponsoring the bill and in the conduct of the hearings on it felt that no legislation would be necessary if no more were intended than a reversal of the *Elgin* case.[6] That was only one of several

---

[5] Sen. Rep. No. 433, 76th Cong., 1st Sess. 15; Hearings before Senate Committee on Interstate Commerce on S. 2009, 76th Cong., 1st Sess. 427, 590, 772.

[6] Senator Reed expressly so stated: "Judge, you remember that Justice Stone, Justice Brandeis, and Justice Cardozo dissented from that majority opinion of the Supreme Court in the *E. J. & E. case*. . . . I am inclined to think that the Supreme [*sic*], as presently constituted, would hold with what was the minority view." Hearings before Senate Committee on S. 2009, 76th Cong., 1st Sess. 68. He later said that he thought the *Elgin* decision "was a strange construction of the law on the part of the Supreme Court of the United States." *Id.* at 309.

The views of Senator Wheeler seem clearly to the same effect. When it was first suggested that the proposed commodities clause would overrule the *Elgin* case, he stated (apparently because he was interested primarily in extending the clause to apply to other types of carriers): "I did not intend such a result." When the effect of the clause was pointed out to him, he expressed doubt whether that

broad purposes of the bill, others being much more sweeping. The new commodities clause, instead of applying only to railroads, would have applied to all types of carriers except air carriers. It is perfectly clear from a reading of the hearings that this proposed application to carriers of all types was what was considered "far too drastic" a change to be included in the Transportation Act of 1940.

---

case should be overruled, not because he approved it, but as he explained because "I am not familiar with the E. J. & E. case." *Id.* 67–68.

Three days later, when the point was again under discussion, Senator Wheeler, at this time apparently refreshed in recollection of the *Elgin* case, frankly stated that one of the purposes of the revised clause was to meet the Supreme Court decision in it. The witness then expressed the view that the revised clause went considerably beyond the decision because it applied to other types of carriers, and to situations where the shipper owned only ten per cent of the carrier's stock. The witness suggested that, if the intent was merely to reverse the *Elgin* case, it would be better to leave the clause in its present form, because "I do not believe the decision in the *E. J. & E. case* is going to prove to be one of the laws of the Medes and the Persians." *Id.* 385.

After more discussion of the effect of the amended version on water carriers and pipe lines, Senator Wheeler remarked: "There are difficulties on that question, in my mind. Suppose we reenacted the law as it is. The question is whether the courts might say, in view of the Supreme Court's decision, 'In reenacting the law, you approved the decision of the Supreme Court.'" *Id.* 386.

The Senator thus was faced with a dilemma. At this point he was apparently persuaded that the extension of the commodities clause to all carriers was a more drastic change than he had originally realized, but hesitated to reenact the old version lest the reenactment be construed as legislative approval of the *Elgin* case. His fear has now been justified by today's decision. It was not until the following week that he reached the conclusion that the drastic nature of the proposed change outweighed the risk that reenactment would be construed as approval of that case. *Id.* 427; and see statements quoted in note 12 *infra.* Such a choice hardly can be construed into "approval" of the decision.

The crucial importance of this extension is abundantly shown from the vigorous objections on behalf of parties that would have been affected by extending the commodities clause to water carriers,[7] to pipe lines,[8] and to motor carriers.[9] It was argued repeatedly that it was proper for shippers to control interests in these carriers for reasons not applicable to carriers by rail. These arguments cannot be read without concluding that the change, whether desirable or not, would have been drastic indeed and would have gone far beyond the intended coverage of the Transportation Act of 1940.[10] Rather than jeopardize the entire legislative program comprehended by the Act,[11] the committee naturally decided that sound strategy required separate consideration of this narrower, but still broad and highly controversial problem.

[7] *Id*. 236, 284–286, 308–310, 385–387, 427–432, 492, 623, 632–633, 692, 753–754, 926–928.

[8] *Id*. 386, 589–597, 606–610, 611–612, 654–660, 736–742.

[9] *Id*. 127, 432–433.

[10] For example, the petroleum industry strenuously opposed the provision because it would have effected the divorcement of pipeline companies from producers. See note 8 *supra*; cf. *id*. at 935. Opposition by farm lobbies was directed particularly at the new commodities clause: "Section 12 appears to endanger the activities of more than 100,000 farmers of our area who have cooperatively associated themselves together and who, because of exorbitant rail rates, are transporting increasing tonnage of grain, livestock, and petroleum products both through cooperative trucking associations and by trucks owned by local or regional cooperatives." *Id*. 432–433. See also *id*. 311. The most vigorous opposition, however, came from parties who would be adversely affected by the applicability of the clause to water carriers. See note 7 *supra*. They pointed out, as an instance of the far-reaching effect of the amendment, that 65 per cent of the privately owned American merchant marine would be affected by the change.

[11] See Hearings 772; cf. note 10 *supra*.

Statements of the committee chairman show that this was the real basis for the conclusion that the amendment would have been "far too drastic."[12]    Indeed they show, together with other statements before the committee, that the *Elgin* decision was regarded as unfortunate and likely to be overruled when another case should arise.[13]    Even the opposition by the short-line railroads was based not on the argument that an overruling of the *Elgin* case would have been too drastic, but rather on the fact that the amended § 12, in conjunction with other proposed legislation, would have prohibited the transportation of commodities for anyone who owned, even as an investment, as much as ten per cent of the stock of the railroad.[14]    And other groups argued that the amendment was too drastic because it was not limited to common carriers.[15]    In sum, the proposed amendment was indeed

---

[12] Senator Wheeler explained the basis for the decision to abandon the proposed amendment more than once.    To shorten testimony by witnesses interested in the effect of the clause on pipe lines and water carriers he stated: "You might as well quit wasting your time, because I made an announcement yesterday with reference to that, and I hope you people will not come here with the idea of taking up a lot of time on that.    I have said that pipe lines are a subject that ought to be given independent consideration, and we cannot take it up and give it the necessary time and study in this bill.    That may be modified or eliminated, so far as pipe lines and water carriers are concerned."    *Id.* 590.    Later he said: "I have felt, frankly, that in this particular legislation, which does divorce, ships from industry, that it was such a broad subject, and one which required so much independent study, that it ought to be handled by separate legislation.    No one in the Government service seems to have made a study of the question.    I felt that it ought to be eliminated from the provisions of this bill at this time, and be introduced as separate, independent legislation, as has been done in the past."    *Id.* 772.

[13] See note 6.

[14] Hearings 541; and see *id.* 285, 385–386.

[15] *Id.* 421, 435, 841.

drastic, but not because it would have accomplished what the committee members assumed this Court would and should do without legislative aid.[16]   It is therefore most unreasonable to conclude that the considerations which prompted the Senate Committee to reject a proposed extension of the commodities clause to all types of carrier compel this Court to deny a request to overrule an interpretation of the impact of the clause on railroads which the most active sponsors regarded as erroneous.

The host of reasons which may have induced the various members of the committee to forego the extremely controversial and drastic extensions forbids any inference that the committee action was the equivalent of approval of the *Elgin* case by the entire Congress.   In fact, the difficulty of interpreting the views of even one legislator without taking account of all he has had to say, as exemplified by the discussion in note 6, should serve as a warning that the will of Congress seldom is to be determined from its wholly negative actions subsequent to the enactment of the statute construed.   In this case the rejection of the proposed amendment is not more, indeed I think it is less, indicative of congressional acquiescence than complete inactivity would have been.   Even if there may be cases where the "silence of Congress" may have some weight, that ambiguous doctrine does not require or support the result which the Court reaches today.   *Girouard* v. *United States,* 328 U. S. 61; cf. *Cleveland* v. *United States,* 329 U. S. 14, concurring opinion at 21.

Nor is that result justified by the "equitable" considerations which the Court's opinion somewhat obliquely advances.   It is suggested that a refusal to follow the *Elgin* precedent would be to apply a different and more drastic rule to Bethlehem than applies to its competitor,

---

[16] See note 6.

the United States Steel Corporation. But, aside from the specious character of an argument that permits X to violate the law on the ground that Y also violates it, there is no explanation offered for the assumption that the overruling of the *Elgin* case would have no effect on United States Steel. The policy of *res judicata* would not apply, cf. *Commissioner* v. *Sunnen,* 333 U. S. 591, and United States Steel, instead of being prejudiced by the course of decision, actually has been benefited by more than a decade of ownership of the Elgin road, contrary to the statute's plain terms and policy.

The Court also feels that the relief requested is *too* drastic because Bethlehem would be compelled to sell its short-line railroads, the Government has not shown that independent ownership of these railroads is likely, nor has it shown that evils exist which would be remedied by this relief. These are considerations which undoubtedly influenced the majority in the *Elgin* case, somewhat differently it would seem from the majority in this one, but which the dissenting justices felt had been foreclosed by the legislative determination of policy. Reliance on such arguments today seems inconsistent with the statement "that if the *Elgin* case were before us as a case of first impression, its doctrine might not now be approved." Moreover, it does not follow that this Court in the exercise of its equity jurisdiction could not adapt the relief afforded so as to give time and opportunity for making the adjustments necessary to secure conformity with the statute in an orderly and inoppressive manner. Indeed it would be the Court's duty to do this.

The arguments on this level are most effectively answered by the dissenting opinion of Mr. Justice Stone, who was joined by Mr. Justice Brandeis and Mr. Justice Cardozo, in the *Elgin* case: "The language of the commodities clause, read in the light of its legislative history,

can leave no doubt that its purpose was to withhold from every interstate rail carrier the inducement and facility for favoritism and abuse of its powers as a common carrier, which experience had shown are likely to occur when a single business interest occupies the inconsistent position of carrier and shipper. See *United States* v. *Reading Co.,* 253 U. S. 26, 60, 61. Before the enactment of the commodities clause, Congress, by sweeping prohibitions, had made unlawful every form of rebate to shippers and every form of discrimination in carrier rates, service and facilities, injurious to shippers or the public. By the Sherman Act it had forbidden combinations in restraint of interstate commerce. But it did not stop there. The commodities clause was aimed, not at the practices of railroads already penalized, but at the suppression of the power and the favorable opportunity, inseparable from actual control of both shipper and carrier by the same interest, to engage in practices already forbidden and others inimical to the performance of carrier duties to the public. See *Delaware, L. & W. R. Co.* v. *United States,* 231 U. S. 363, 370; *United States* v. *Reading Co., supra."* 298 U. S. at 504.[17]

In my opinion this expresses the intent of the letter and the policy of the commodities clause, and we should now return to it on our own responsibility. Congress should not again be required to reenact what it has once provided for, only to have its mandate nullified in part by this Court's misconstruction.

---

[17] See also note 4.