# IN THE SUPREME COURT OF TEXAS

════════════
No. 16-0356
════════════

CITY OF SAN ANTONIO, PETITIONER,

v.

ROXANA TENORIO, INDIVIDUALLY AND
ON BEHALF OF PEDRO TENORIO, DECEASED, RESPONDENT

════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FOURTH DISTRICT OF TEXAS
════════════════════════════════════════

JUSTICE JOHNSON delivered the opinion of the Court, in which CHIEF JUSTICE HECHT, JUSTICE GREEN, JUSTICE DEVINE, and JUSTICE BROWN joined.

JUSTICE GUZMAN filed a dissenting opinion.

JUSTICE BOYD filed a dissenting opinion, in which JUSTICE LEHRMANN and JUSTICE BLACKLOCK joined.

The question in this interlocutory appeal is whether the City of San Antonio has governmental immunity from a suit for damages arising out of a collision between a car and a motorcycle. The trial court denied the City's plea to the jurisdiction based on such immunity. The court of appeals affirmed. We reverse and dismiss for lack of jurisdiction.

## I. Background

On September 21, 2012, Roxana Tenorio and her husband, Pedro, were riding a motorcycle in a northbound lane of SW Loop 410 in San Antonio when they were hit head-on by a southbound vehicle being driven by Benito Garza. The collision killed Pedro and severely injured Roxana. Until

shortly before the collision, officers of the San Antonio Police Department (SAPD) had been pursuing Garza because they suspected him of being involved in an armed robbery. When Garza entered the Loop going the wrong way, however, the officers discontinued the pursuit.

Roxana, individually and "on behalf of Pedro Tenorio, Deceased" (Tenorio), sued Garza and the City. She alleged that the police officers were negligent in initiating, continuing, and failing to terminate the high speed chase; the City had actual notice of her claims; and the City's immunity was waived by the Texas Tort Claims Act (TTCA). *See id.* § 101.101, .021. The City responded to Tenorio's suit, in part, with a plea to the jurisdiction. The City asserted that Tenorio failed to give notice of claim as required by the TTCA as well as the City's Charter, and that the City did not have actual notice that it was at fault in causing the collision. The City supported its plea with multiple documents, including sworn witness statements and police reports regarding the collision. Tenorio replied and attached various SAPD documents. The trial court denied the City's plea.

The City filed an interlocutory appeal. *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(8). The court of appeals affirmed, concluding there was a fact issue as to whether the City had actual notice of Tenorio's claims. ___ S.W.3d ___ (Tex. App.—San Antonio 2016). The court emphasized that the proper inquiry is not whether some evidence showed that SAPD was negligent but "whether [the record contained] evidence raising a fact issue as to whether SAPD was subjectively aware that it *played a role* in producing or contributing to Roxana's and Pedro's injuries." *Id.* at ___ (emphasis added). The appeals court concluded that the evidence raised a fact issue regarding "whether the City was aware of its role in contributing to the claimed injuries" because the investigating officer determined that "Fleeing or Evading Police" was a factor contributing to the accident. *Id.* at ___.

2

In this Court, the City argues that the court of appeals applied an erroneous standard. The City maintains that the correct standard is whether it was subjectively aware that some *fault* on its part caused the collision, not whether it was subjectively aware that it simply played a role in producing or contributing to it. The City maintains that the crash report's listing "Fleeing or Evading Police" as a contributing factor to the collision does not raise a fact issue as to whether the City was at fault in causing it.

Tenorio responds that the court of appeals used the proper standard. In her view, the appeals court used the phrase "played a role" to point out that fault is not synonymous with liability in the context of determining actual notice but to imply some responsibility for the injuries claimed. She also argues that the City confuses fault with complete liability, meaning that the City improperly views fault in this context as referencing the City being exclusively at fault. Lastly, Tenorio argues that the court of appeals correctly held that because the crash report listed "Fleeing or Evading Police" as a contributing factor to the collision, there was a fact issue as to whether the City had subjective awareness of its fault.

We agree with the City.

## II. Discussion

Generally, governmental entities are immune from suits seeking to impose tort liability on them. *See Ryder Integrated Logistics, Inc. v. Fayette County*, 453 S.W.3d 922, 926 (Tex. 2015). That immunity deprives trial courts of subject matter jurisdiction over such suits, absent a waiver of the immunity. *Id.* at 927. The TTCA contains such a waiver if notice as prescribed by statute is given. *City of Dallas v. Carbajal*, 324 S.W.3d 537, 537–38 (Tex. 2010); *see also* TEX. GOV'T CODE § 311.034. Under the TTCA, a governmental unit must be given notice of a claim against it "not

3

later than six months after the day that the incident giving rise to the claim occurred." TEX. CIV. PRAC. & REM. CODE § 101.101(a). This notice of claim must describe "(1) the damage or injury claimed; (2) the time and place of the incident; and (3) the incident." *Id.* Claimants must also comply with any proper time requirements for notice that a city has adopted by charter or ordinance. *Id*. § 101.101(b) ("A city's charter and ordinance provisions requiring notice within a charter period permitted by law are ratified and approved."). San Antonio's charter requires written notice of claim within ninety days after the injuries or damages were sustained. SAN ANTONIO, TEX., CITY CHARTER art. XII, § 150.

However, the written notice requirements in the TTCA do not apply if a governmental unit has actual notice. TEX. CIV. PRAC. & REM. CODE § 101.101(c); *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex. 1995). Knowledge that a death, injury, or property damage has occurred, standing alone, is not sufficient to put a governmental unit on actual notice for TTCA purposes. *Cathey*, 900 S.W.2d at 341. To have actual notice, a governmental unit must have the same knowledge it is entitled to receive under the written notice provisions of the TTCA. *See Tex. Dep't of Criminal Justice v. Simons*, 140 S.W.3d 338, 347 (Tex. 2004). Thus, the actual notice provision requires that a governmental unit has subjective awareness that its fault, as ultimately alleged by the claimant, produced or contributed to the claimed injuries. *See id*. A governmental unit has actual notice under the TTCA if it has subjective knowledge of (1) a death, injury, or property damage; (2) the governmental unit's fault that produced or contributed to the death, injury, or property damage; and (3) the identity of the parties involved. *See Cathey*, 900 S.W.2d at 341.

Whether a governmental unit has actual notice is a fact question when the evidence is disputed, but it is a question of law when the evidence is undisputed. *Simons*, 140 S.W.3d at 348.

4

The actual notice requirement is not met just because the governmental unit (1) should have investigated an accident as a prudent person would have, (2) investigated an accident as part of its routine safety procedures, or (3) should have known it might have been at fault based on its investigation. *Id.* at 347–48.

If a governmental unit investigates an accident, whether the information acquired through its investigation meets the actual notice requirements of the TTCA depends upon the particular facts of the case. For example, in *Carbajal*, Olivia Carbajal sued the City of Dallas for injuries she sustained after driving her vehicle into a gap on an excavated road. 324 S.W.3d at 538. The police report stated that Carbajal saw barricades, but none were blocking what she thought was a clear way to get on the freeway. *Id.* The report also noted that there were no barricades directly blocking the gap in the road. *Id.* This Court held that the police report "was at most an initial response to the accident" and did not imply, let alone expressly state, that the City was at fault. *Id.* at 537, 539. Thus, the report was insufficient to show that the City had actual notice under the TTCA. The report described the apparent cause of the accident—the missing barricades—but did not say who failed to erect or maintain the barricades. *Id*. at 539.

By contrast, in *University of Texas Southwestern Medical Center at Dallas v. Estate of Arancibia*, a patient died after her bowel was perforated during a laparoscopic hernia surgery. 324 S.W.3d 544, 546 (Tex. 2010). Her family sued the hospital where the surgery took place. *Id*. The hospital filed a plea to the jurisdiction, claiming that the family failed to provide timely notice under the TTCA. *Id*. This Court determined that the hospital had actual notice because (1) Dr. Watson was present during the patient's surgery; (2) the day after the patient died Dr. Watson emailed his supervisor, stating that the doctors involved in the surgery failed to recognize the bowel injury and

5

he had already spoken to risk management personnel; and (3) Dr. Watson recognized that the bowel perforation was a retraction injury that occurred out of the surgeon's field of view. *Id.* at 549–50. Dr. Watson's supervisor concluded that a technical error during the surgery resulted in the bowel injury. *Id*. at 549. The supervisor further noted that "clinical management contributed to" the patient's death and that although no standard of care issues were identified, the care "was not necessarily consistent with established standards." *Id.* We noted that as it pertains to actual notice under the TTCA, fault is not synonymous with liability but implies responsibility for the claimed injury. *Id.* at 550. In that case the hospital was subjectively aware that its doctors' errors were causally related to the perforations and that clinical management not "consistent with established standards" contributed to the patient's death. *Id.* at 549–50.

In this case Tenorio relies on (1) the crash report, (2) the witness statements, and (3) the case report to show that the City had subjective awareness its officers were at fault in several ways regarding their pursuit of Garza and that their fault was related to the collision and resulting injuries. An SAPD investigator prepared the crash report on the day of the collision. The investigator indicated that "Contributing Factors (Investigator's Opinion)" included "Fleeing or Evading Police." The investigator's narrative stated that Garza "drove onto the main lanes of the [highway] against oncoming traffic and collided with" the Tenorios' motorcycle. The case report indicated that Garza "was suspected to be involved in a robbery with a deadly weapon"; "while evading police in the vehicle [Garza] drove the wrong way down the highway and struck a motorcycle with 2 passenger [sic]"; and as Garza "was fleeing the police he jumped onto the main lanes and struck" the Tenorios. Garza was charged, among other things, with "Evading Arrest/Detention – Causing Death."

6

In support of its plea to the jurisdiction, the City presented statements from two SAPD officers who were pursuing Garza. One of the officers stated that he informed the dispatcher of their direction of travel, speed, and traffic conditions, and immediately asked for and received supervisory approval to continue the pursuit. The officer also continually gave updates on speed, direction, and traffic conditions. However, as soon as the officer saw Garza's vehicle veer off the road and enter the Loop exit ramp traveling against traffic, he broadcast an order on the radio for all officers to terminate the pursuit. He opined that Garza traveled approximately 300 feet after entering the Loop before colliding with the Tenorios' motorcycle. The officer in the other car participating in the pursuit averred that he heard an order over the radio to terminate the pursuit as soon as Garza drove onto the exit ramp traveling the wrong direction. After hearing the order, that officer took a turnaround and entered the northbound lanes of the Loop traveling in the proper direction for traffic rather than pursuing Garza onto the Loop against traffic.

The City also submitted statements from eight witnesses in different vehicles. The witnesses confirmed that once Garza drove onto the ramp traveling against traffic, the SAPD officers stopped their pursuit.

The court of appeals relied on the investigating officer's statement in the crash report that a factor contributing to the crash was Garza's "Fleeing or Evading Police" as evidence creating a fact issue as to whether the City was subjectively aware that it was at fault. ___ S.W.3d at ___. The court noted that absent such opinion in the Crash Report, this case would be similar to *Muniz v. Cameron County*. *Id.* at ___ (citing *Muniz v. Cameron Cty.*, No. 13-10-00689-CV, 2012 WL 1656326 (Tex. App.—Corpus Christi May 10, 2012, pet. denied)). In *Muniz*, a deputy pursued a truck after attempting to pull it over as part of a routine traffic stop. 2012 WL 1656326, at *1. The

7

truck veered into the path of oncoming traffic and struck and killed Margarita Muniz. *Id.* The accident occurred less than two miles from where the deputy first observed the truck, and the entire pursuit lasted about a minute. *Id.* The police report stated that the driver of the truck was responsible for the accident and Muniz's death. *Id.* at *1–2. In their suit against the County, the Muniz family alleged that the County was liable for damages because the deputy initiated and continued a reckless, high-speed pursuit. *Id.* The family also alleged that the deputy bumped into the driver's truck several times, causing it to move into oncoming traffic. *Id.* The family supported this allegation with an affidavit from the fleeing driver, stating that he would not have wrecked if the deputy had not bumped him. *Id.* However, nothing in the police report nor the dispatch log suggested that the deputy bumped into the truck. *Id.* at *5. The court of appeals held that the driver's veering his truck into Muniz's lane and causing her death, combined with the fact that the there was no report to the effect that the deputy hit either vehicle, gave notice only of the pursuit and were insufficient to place the County on actual notice that Muniz's family would attempt to hold it responsible for her death. *Id.* at *6. The court of appeals concluded that *Muniz* was distinguishable from this case because the police report in this case specifically notes Garza's "Fleeing or Evading Police" as a factor contributing to the fatal collision. ___ S.W.3d at ___.

In contrast, in *Arancibia*, a hospital supervisor noted that a technical error was made, clinical management contributed to the patient's death, and the care was not necessarily consistent with established standards. 324 S.W.3d at 549. In that case, the supervisor's "ultimate conclusion that those errors were acceptable [did] not detract from his subjective awareness that medical error contributed to" the patient's death. *Id.* at 549–50. The government conceded that surgical error resulted in the perforation of the patient's intestines and ultimately resulted in her death. *Id.* at 550.

Evidence that a vehicle being pursued by the police is involved in a collision is not, by itself, sufficient to raise a fact question about whether the City, for purposes of the TTCA, had subjective awareness that it was in some manner at fault in connection with the collision. While the crash report listed a factor and condition contributing to the crash as "Fleeing or Evading Police," this is not an express statement or even an implication that the officers or the City were at fault in regard to the collision. *See Carbajal*, 324 S.W.3d at 538–39. If it were, the actual notice provision of the TTCA would be meaningless in evading police situations: actual notice would exist every time a collision with injuries or property damage occurred when a driver was fleeing or evading police, regardless of the other facts. *See Cathey*, 900 S.W.2d at 341.

Tenorio correctly asserts that the City's belief that its employees were not negligent does not mean that the City did not have subjective awareness that it was at fault in connection with the collision. However, nothing in the crash report, witness statements, or case report indicate, either expressly or impliedly, that the SAPD subjectively believed its officers acted in error by initiating or continuing the pursuit such that they were in some manner responsible for the injuries. Accordingly, the City did not have actual notice that it was at fault in connection with the collision, as is required by the TTCA for the City's immunity to have been waived. That being so, the trial court lacked jurisdiction over the claims.

### III. Response to the Dissents

JUSTICE GUZMAN would hold that a fact question exits as to whether the City had actual notice of Tenorio's claims. She concludes that the police investigation, the crash report, and a witness statement constitute circumstantial evidence that the City was on notice that its alleged fault was a producing or contributing factor to the Tenorios' injuries. *Post* at __ (Guzman, J., dissenting).

9

But as noted above, we explained in *Cathey* that for a governmental entity to have actual notice, it must have *subjective awareness* that its fault, as alleged by the claimant, produced or contributed to the claimed injuries. *See Cathey*, 900 S.W.2d at 341. JUSTICE GUZMAN does not point to any evidence that the City was subjectively aware that its fault produced or contributed to the injuries or that the City believed its employees were negligent or acted in error, and instead concludes that subjective awareness of *potential fault* satisfies the notice requirement. *See id.* (noting that the evidence did not raise a fact issue that the defendant had actual notice of any alleged culpability). Further, we have recognized that it is not enough that the governmental unit conducted an investigation. *Simons*, 140 S.W.3d at 348.

JUSTICE BOYD asserts that because he disagrees with the Court's interpretation of section 101.101(c) in *Cathey*, he would overrule that case (and those that have followed and relied upon it) and hold that the City had actual notice of Tenorio's claims. But as JUSTICE BOYD recognizes, Tenorio does not argue that *Cathey* was incorrectly decided or that we should overrule it. *Post* at __ (Boyd, J., dissenting); *see Dall. Cty. Cmty. Coll. Dist. v. Bolton*, 185 S.W.3d 868, 883 (Tex. 2005) (noting that the Court does not address issues not raised by the parties). And as JUSTICE BOYD further recognizes, "The doctrine of stare decisis 'has its greatest force' in 'the area of statutory construction' because 'the Legislature can rectify a court's mistake, and if the Legislature does not do so, there is little reason for the court to reconsider whether its decision was correct.'" *Post* at __ (quoting *Sw. Bell Tel. Co. v. Mitchell*, 276 S.W.3d 443, 447 (Tex. 2008)).

JUSTICE BOYD would not apply the legislative acceptance doctrine here for multiple reasons. First, he claims the Legislature's failure to amend a statute does not equate to legislative approval because we do not generally attach significance to the Legislature's failure to act. *Post* at __. But

10

in discussing the legislative acceptance doctrine, we have acknowledged that "the effect which should be given to legislative inaction varies with circumstances." *Moss v. Gibbs*, 370 S.W.2d 452, 458 (Tex. 1963). There we agreed with the United States Supreme Court that "when the questions are of statutory construction, not of constitutional import, [the Legislature] can rectify our mistake, if such it was, or change its policy at any time, and in these circumstances reversal is not readily to be made." *Id.* at 458–59 (quoting *United States v. S. Buffalo Ry. Co.*, 333 U.S. 771, 774–75 (1948)). Because in that case the Legislature had not amended a statute in the twenty-six years since we had interpreted it, we concluded it was "now a policy matter for the Legislature." *Id.* at 458.

JUSTICE BOYD also claims that legislative inaction cannot be interpreted as legislative acceptance here because the Court has failed to express a clear and understandable rule with regard to the 101.101(c) requirements. *Post* at __ (citing *Grapevine Excavation, Inc. v. Md. Lloyds*, 35 S.W.3d 1, 6 (Tex. 2000) (Phillips, C.J., dissenting). But had the Legislature believed that *Cathey* imposed unclear requirements, the Legislature could have clarified those requirements. *See Moss*, 370 S.W.2d at 458.

Next, JUSTICE BOYD asserts that the language of section 101.101(c) is unambiguous and the legislative acceptance doctrine does not apply when a statute is unambiguous. *Post* at __. "A statute is ambiguous if its words are susceptible to two or more reasonable interpretations, and we 'cannot discern legislative intent in the language of the statute itself.'" *Tex. State Bd. of Exam'rs of Marriage & Family Therapists v. Tex. Med. Ass'n*, 511 S.W.3d 28, 41 (Tex. 2017) (quoting *Tex. Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 639 (Tex. 2010)). While JUSTICE BOYD asserts that the language is unambiguous and thus it has only one meaning, the *Cathey* Court analyzed the statutory language and interpreted it differently than he would. *Cathey*, 900 S.W.2d at

11

341. The passage of time and lack of legislative action indicate that the Court in *Cathey* did not misread the statutory language. This validates the Court's interpretation at least to the extent that the statutory language is susceptible to two or more reasonable interpretations and thus, at a minimum, is ambiguous.

Finally, JUSTICE BOYD claims that the legislative acceptance doctrine only applies when a statute is re-enacted without change, and section 101.101 has not been amended or re-enacted. *Post* at __. While the Legislature has not amended or re-enacted section 101.101, it has amended other sections of the TTCA every session but two since *Cathey* was decided in 1995. Further, this Court has applied the legislative acceptance doctrine in instances where the Legislature failed to act. *See, e.g.*, *Krishnan v. Sepulveda*, 916 S.W.2d 478, 481 (Tex. 1995) ("[T]he Legislature has not amended the wrongful death and survival statutes . . . . Such Legislative inaction suggests approval of our holdings . . . ."); *Moss*, 370 S.W.2d at 458 (noting that thirteen legislative sessions had passed since the Court construed the statute at issue and that legislative inaction indicated "legislative approval" of the construction or "that the general dissatisfaction therewith was not of sufficient strength to impel legislative action").

"Adhering to precedent fosters efficiency, fairness, and legitimacy. More practically it results in predictability in the law, which allows people to rationally order their conduct and affairs." *Grapevine Excavation, Inc. v. Maryland Lloyds*, 35 S.W.3d 1, 5 (Tex. 2000) (citation omitted). We decline to overrule *Cathey*.

## IV. Conclusion

We grant the petition for review. Without hearing oral argument, we reverse the judgment

12

of the court of appeals and render judgment dismissing the cause for want of jurisdiction. *See* TEX.

R. APP. P. 59.1.

_____
Phil Johnson
Justice


**OPINION DELIVERED:**  March 23, 2018