The **UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Joe Alvin ANDERSON,**
**Defendant–Appellant.**

No. 87–2905.

United States Court of Appeals,
Fifth Circuit.

Sept. 28, 1989.

Stanley G. Schneider, Thomas D. Moran, Houston, Tex., for defendant-appellant.

Paula C. Offenhauser, Frances H. Stacy and Don Degabrielle, Asst. U.S. Attys., Houston, Tex., for defendant-appellant.

Before CLARK, Chief Judge, GOLDBERG, GEE, REAVLEY, POLITZ, KING, JOHNSON, WILLIAMS, GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS, JONES, SMITH, and DUHE, Circuit Judges.[*]

GEE and GARWOOD, Circuit Judges:

Today's case presents an unusual issue: whether or not we should continue to adhere to Circuit precedent permitting conviction of certain felonies without proof of *mens rea*. Concluding that such a rule is aberrational in our jurisprudence—a jurisprudence largely based on the Anglo-Saxon common law—we discard it.

## Facts

Defendant Joe Alvin Anderson was arrested for possessing two automatic pistols and various silencer parts in violation of a provision of the National Firearms Act, 26 U.S.C. § 5861.[1] The weapons, along with several semi-automatic pistols, were found in a vault in Anderson's home. The premises had been searched pursuant to a warrant covering both it and an adjacent business property also owned by Anderson; a magistrate had issued the warrant based upon the affidavit of a witness who had observed evidence of drug-dealing activity, primarily at the business address but also at Anderson's residence. No prohibited substances were found during the search.

Anderson was tried and convicted on the weapons charges. He then appealed to our court, contending that there was no probable cause to support the warrant to search his house; that the jury instruction requiring for conviction only that he knew the guns were firearms in a general sense, as opposed to knowing that they were automatic weapons, was erroneous; and that the evidence was insufficient to support conviction on either count. A panel of our court affirmed. *United States v. Anderson,* 853 F.2d 313 (5th Cir.1988).

Writing for the panel majority, however, Judge Garwood strongly suggested that *United States v. Vasquez,* 476 F.2d 730 (5th Cir.), *cert. denied,* 414 U.S. 836, 94 S.Ct. 181, 38 L.Ed.2d 72 (1973), holding that proof of specific knowledge that a weapon is automatic is not required for a conviction, was wrongly decided, even though he was bound by that decision. *Anderson,* 853 F.2d at 317–21. Judge Jolly urged that *Vasquez* be reexamined *en banc. Id.* at 322 (Jolly, J., concurring). We granted rehearing *en banc* in order to reconsider our holding in *Vasquez.* 860 F.2d 166 (5th Cir.1988). We reverse the panel's holding

---

[*] When this case was orally argued before and considered by the court, Judge Rubin was in regular active service. He participated in both the oral argument and the en banc conference.

In *United States v. American–Foreign Steamship Co.,* 363 U.S. 685, 80 S.Ct. 1336, 4 L.Ed.2d 1491 (1960), the Supreme Court, interpreting 28 U.S.C. § 371(b), decided which senior judges are eligible to participate in an en banc court. Compare *United States v. Cocke,* 399 F.2d 433, 435 n. 4 (5th Cir.1968) (en banc). As Judge Rubin reads the *American–Foreign Steamship Co.* opinion, he considers himself ineligible now to participate in the decision of this case, and he has not therefore done so.

Judge Goldberg, although a senior judge, was a member of the original panel which decided this appeal and has elected, pursuant to Local Rule 35.6, to participate as a member of the en banc court.

1. The two pistols are identical in appearance to semi-automatic models that can be lawfully purchased and owned without registration under the Act. These guns had been made automatic by modification of their internal mechanisms; it is disputed whether a non-expert could discern this without firing them. Accompanying the pistols was a manual on how to modify semi-automatic pistols into fully automatic ones. The silencer parts found were insufficient to form a fully-assembled silencer. However, one portion found was, even in its incomplete state, capable of muffling a gunshot to some extent.

on *mens rea* and overrule *Vasquez*, but adopt the panel's treatment of the remaining issues.[2]

### Background

The Act, 26 U.S.C. § 5861 et seq., prohibits the ownership or transfer of certain enumerated "firearms" that have not been registered and approved as required. As used in the Act, the word "firearms" is a term of art that includes primarily weapons thought to be of a military nature and of no legitimate use for sport or self-defense. Conventional revolvers and semi-automatic pistols are not among the covered "firearms" enumerated in section 5845; "machine guns," however, are.[3] The fully automatic pistols possessed by the instant defendant qualify as "machine guns," as they will fire more than one round of ammunition in response to a single pull of the trigger. Section 5845(b).[4]

"Firearms," such as machine guns, that fall under the Act are subject to elaborate registration and approval procedures. Sections 5812, 5841. In this case, Anderson was charged with violating section 5861(d), which makes it unlawful for any person to "... possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record...."

A little over sixteen years ago, in *United States v. Vasquez*, 476 F.2d 730 (5th Cir. 1973), a panel of our court construed a portion of the National Firearms Act to have been meant by the Congress to subject citizens innocent of any *mens rea* to the heavy fines and penalties provided by it—up to ten years imprisonment, up to a $10,000 fine, or both. Today, we reverse the judgment of the trial court and overrule that decision.

### The Act and the Issue

The National Firearms Act is drafted in a peculiar manner. Reading through the first of its general provisions, Section 5841, one would at first think it a comprehensive enactment indeed. The first sentence of that section commences, "The Secretary shall maintain a central registry of all firearms in the United States...." Upon arriving at Section 5845, however, our reader, if he or she persevered so far, would discover that the term "firearms," as used in the Act, is an extreme instance of usage in the manner that lawyers term "words of art." Indeed, at no point in the Act is "firearms" used in its general dictionary sense, "A weapon from which a shot is discharged by gunpowder—usually used only of small arms." Webster's Third New International Dictionary Unabridged.

Instead, the term is defined in the Act so as to narrow its meaning vastly in most respects and vastly to expand it in a few, producing a statutory meaning of "firearm" that overlaps the area covered by the common meaning of the term to an insignificant degree only. Generally speaking, all such categories of ordinary rifles, pistols and shotguns as might be found in a gunshop are excluded from its meaning, with only a few easily-concealable items such as sawed-off shotguns included, along with machine guns. In addition, various items entirely outside the commonly understood sense of the term are included in the

---

**2.** In his *en banc* brief, in addition to contesting the rule established by *Vasquez*, defendant raises the same fourth amendment defective-warrant and sufficiency-of-the-evidence challenges disposed of by the panel. He also argues for the first time that the district court's definition of "silencer" in its jury instructions, given in accordance with a statute enacted subsequent to his arrest, violates the constitutional prohibition of *ex post facto* laws. We do not consider novel contentions at this stage of proceedings, however.

**3.** For those unfamiliar with firearms terminology, it may be helpful to offer a few definitions. An "automatic" weapon or "machine gun" is one which commences firing when the trigger is depressed and continues firing until it is released, or the weapon's supply of ammunition is exhausted. A "semi-automatic" weapon or "auto-loader" is one which fires only one shot when the trigger is depressed but which reloads itself, so that when the trigger is released and again depressed it fires again, and so on. To add to the confusion, shooters usually refer to semi-automatic weapons as "automatics," doubtless because they reload themselves automatically by employing some of the explosive force of the round last fired.

**4.** Unless otherwise noted, section references hereinafter are to title 26 U.S.C.

Act's definition of "firearms": artillery pieces, mines, bombs, grenades and the like, along with silencers. In short, the term as used in the Act bears little if any correspondence to that in common usage, much as though the word "animal" were defined in some supposititious National Zoo Act to exclude all mammals, reptiles and birds except lions and tigers, but to include freight trains, teddy bears, feather-boas and halltrees. So much for the Act and its "firearms": what signifies for present purposes is that knowing or proving that a thing is a firearm in the ordinary sense of the term tells almost nothing about whether it is a "firearm" for purposes of the Act; and of this, more later.

The issue on which we disagree with the earlier *Vasquez* holding is legally narrow but factually broad—that regarding semi-automatic weapons that have, without the changing of their external appearance, been altered by design or by the effects of use and wear so that they fire more than one shot at a pull of the trigger and so have become "machine guns" for purposes of the Act.

Countless numbers of semi-automatic weapons stand in the closets and gun cabinets of this land. Several of the most popular shotgun models, many handguns, and not a few rifles are autoloaders; and either wear and tear or a simple operation can convert any of these from a firearm in the ordinary sense into a "firearm" in the sense defined by the Act. Where, as here, the criminal charge is that of possessing such an arm—one that looks like only a firearm but is in fact a "firearm"—we conclude that a conviction should require that the charged party knew it was a "firearm" in the *Act* sense, not that he (or she) merely knew it was a firearm.[5]

5. In fact, making this latter sort of semi-scienter an element of proof of the offense produces very strange consequences indeed. In the first place, any person likely to be charged under the Act will surely know that the object which he or she possesses is a firearm in the general sense, so that such proof is no proof at all. In the second, as we have noted, many firearms in the general sense are not "firearms" in the Act sense

*Freed*

In reconsidering the *Vasquez* decision, we turn first to *United States v. Freed*, 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971), upon which it is largely based. We do so because if, as *Vasquez* maintains, this is apposite Supreme Court precedent, then we are bound by it and our inquiry is at an end. The *Vasquez* interpretation of *Freed* reads as follows:

> In the majority opinion in *Freed*, Justice Douglas stated the following rule:
>
>> By the lower court decisions at the time [the Act was amended] the only knowledge required to be proved was knowledge that the instrument possessed was a firearm. See *Sipes v. United States*, 8 Cir., 321 F.2d 174, 179, and cases cited.
>
> . . . .
>
>> These two explicit references to *Sipes* and its cited cases, including [United States v.] *Decker*, [292 F.2d 89 (6th Cir.1961)], make it abundantly clear that Justices Douglas and Brennan used the term "firearm" in its general meaning, not in its technical statutory meaning.
>
> 476 F.2d 730, 731–32 (5th Cir.) *cert. denied*, 414 U.S. 836, 94 S.Ct. 181, 38 L.Ed.2d 72 (1973).

Our reading of *Freed* is otherwise.

What the *Vasquez* panel overlooked is that the issue upon which it was pronouncing was not before the *Freed* court at all and that the expressions from that opinion on which it founded its position are not even dicta upon the question that we face today, but merely observations along the way to decision of a different issue entirely. That issue, as shown both by the somewhat cryptic opinion of the *Freed* Court and by the briefs of the parties in that appeal, summarized at 28 L.Ed.2d 1007 *et seq.*, was not the issue in today's case—

at all, so that knowledge that one possesses a firearm in the general sense tells little or nothing about knowing that you have one in the Act sense. And finally, what of items such as silencers and land mines, which are not firearms in the general sense at all? Are the elements of proof to be deemed different where they are concerned?

which is whether the defendants could be convicted only if they knew what they possessed was a "firearm" in the Act sense or whether their knowledge merely that it was a firearm in the ordinary sense would suffice. Indeed, that neither was nor could have been the issue in *Freed*, for what the *Freed* defendants possessed was hand grenades; and hand grenades are not firearms in the general or dictionary sense at all. Such an issue was not before the Court, and the Court did not decide it. Indeed, it could not have done so, for—as is made embarrassingly clear by passages from the Government's *Freed* brief, quoted in the margin—the Government *conceded* that it had to prove that the item possessed was known to the defendant to be a "firearm" in the Act sense.[6]

What it did decide is plainly shown by the full passage from the Court's opinion, given in elided form above in the quotation from *Vasquez:*

> The Act requires no specific intent or knowledge *that the hand grenades were unregistered.* It makes it unlawful for any person "to receive or possess a firearm which is *not registered* to him." By the lower court decisions at the time *that* requirement was written into the Act the only knowledge required to be proved was knowledge that the instrument possessed was a firearm. See *Sipes v. United States,* 321 F.2d 174, 179, and cases cited.

401 U.S., at 607, 91 S.Ct., at 1117 (emphasis added, footnote omitted).[7] And so it is that

---

**6.** At pages 7 and 8 of the "Brief for the United States" in *Freed,* filed by then Solicitor General Griswold on December 3, 1970, appears a passage which the Court partly incorporated in its opinion, quoted in text on the next page:

> The district court erred in construing Section 5861(d) as requiring as an element of the government's proof a showing that the transferee obtained possession of a firearm with specific knowledge and intent that the firearm be unregistered. The statute contains no language suggesting the need for such proof, and the history of its predecessors, both in Congress and in the courts, conclusively shows that such a construction has never been thought to be part of the statute, or necessary to save the statute from constitutional doubt. All that the government needs to show is that the individual charged possessed the firearm which was unregistered, *with knowledge that it was a firearm,* and with intent to possess it.
>
> *Given the extremely dangerous character of firearms subject to the Act,* it is inaccurate to characterize such a construction as imposing a penalty "for conduct alone without regard to the intent of the doer." *Lambert v. California,* 355 U.S. 225, 228 [78 S.Ct. 240, 242, 2 L.Ed.2d 228 (1957)]. *The very nature of the weapons* is sufficient to apprise an individual possessing them that they are likely to be regulated, and thus is also sufficient to make a failure to inquire as to the lawfulness of the possession culpable behavior in the ordinary sense. Hand grenades are certainly no less dangerous than narcotic drugs, as to which similar penalties have always been found proper. *United States v. Balint,* 258 U.S. 250, 254 [42 S.Ct. 301, 303, 66 L.Ed. 604 (1922)].... The government must show that appellees were in possession of hand grenades, knowingly and intentionally; but it need not show any knowledge or intent on

their part that these grenades be unregistered (emphasis added throughout).

The same brief also states (p. 25): "To be sure, there must be some evidence of mental state—that the accused *knew he possessed a firearm* and that he intended to be in possession;...." (Emphasis added.)

**7.** As we have noted, *Vasquez* took the position that the word "firearm" in the above quotation referred to firearms in the common usage of that word, not "firearm" as defined in the Act. However, nothing in the Act supports that analysis, because the Act simply does not deal at all with firearms in the commonly understood meaning of the word.

Nor does *Sipes* support that construction. In *Sipes,* the defendant was apprehended running away from the police, carrying a rifle having a fourteen and a half inch barrel. It had a nail for a firing pin, and when test fired was found to fire on the first attempt. The defendant testified that when he initially found the weapon it did not have a firing pin. The Court observed that "the inference that [defendant] Sipes inserted the nail is proper and creates a knowing 'making' on his part." 321 F.2d at 179. There was no contention that Sipes was unaware of any of the physical characteristics of the weapon. The *Sipes* court noted that in some other decisions it had been stated that "'scienter is not involved'" in such offenses, citing *United States v. Decker,* 292 F.2d 89, 90 (6th Cir.), *cert. denied,* 368 U.S. 834, 82 S.Ct. 58, 7 L.Ed.2d 36 (1961), but went on to say, "[W]e need not go so far.... There can be no question that the defendant's possession of the weapon was a knowing one." 321 F.2d 174, 179 (8th Cir.), *cert. denied,* 375 U.S. 913, 84 S.Ct. 208, 11 L.Ed.2d 150 (1963).

And as for *Decker,* the Sixth Circuit has rejected it as of this writing. *See United States v. Williams,* 872 F.2d 773 (6th Cir.1989).

all of the *Freed* language upon which *Vasquez* relied to decide the issue in today's case was spoken by the Court in deciding an entirely different one: whether the Act requires "specific intent or knowledge that the hand grenades were *unregistered.*" And even as to this issue, the *Freed* Court observes that vicious intent was doubtless assumed by Congress to be present in such a case as that before it; speaking of the Act, it remarks that "[t]his is a regulatory measure ... which may well be premised on the theory that *one would hardly be surprised to learn that possession of hand grenades is not an innocent act.*" 401 U.S. at 609, 91 S.Ct. at 1118 (emphasis added).

One may well doubt, however, that the Court would have written "one would hardly be surprised to learn that possession of *a .22 caliber target pistol* is not an innocent act," yet this is the effect of translating the Court's hand grenade holding into a general one. Especially is this so in view of the sentence in the Court's opinion immediately following that quoted:

> They [the hand grenades] are highly dangerous offensive weapons, no less dangerous than the narcotics involved in *United States v. Balint,* 258 U.S. 250, 254, 66 L.Ed. 604, 606, 42 S.Ct. 301, where a defendant was convicted of sale of narcotics against his claim that he did not know the drugs were covered by a federal act.

*Ibid.*

Finally, in his separate concurrence (quoted elsewhere by the *Vasquez* panel), Justice Brennan cautions "that *mens rea* is not a unitary concept, but may vary as to each element of a crime; ..." 401 U.S. at 613, 91 S.Ct. at 1120. He also observes— and the *Freed* majority does not dispute— that "[t]he Government and the Court agree that the prosecutor must prove ... knowledge that the items possessed were hand grenades." *Id.* at 612, 91 S.Ct. at 1119.

In sum, it is readily apparent that *Freed* did not decide the issue that is before our Court and that, therefore, it in no way trammels our judgment in today's case. And what it does offer goes against the view of *Vasquez.*[8]

### The Automatic Semi–Automatic

As we have noted, under the *Vasquez* construction of the Act it is possible for one to be guilty of a felony punishable by severe penalties by innocently possessing— perhaps by inheritance, for example—a semi-automatic pistol, say, which has become a machine gun by alteration or by wear and tear. That such consequences should attend mere ignorance or failure to investigate an apparently legal item is aberrational in our legal system.

Although Section 5861(d) does not contain express wording—such as "knowingly"—imposing a *mens rea* requirement, it is well settled that "far more than the simple omission of the appropriate phrase from the statutory definition [of the offense] is necessary to justify dispensing with" a *mens rea* requirement. *Liparota v. United States,* 471 U.S. 419, 426, 105 S.Ct. 2084, 2088, 85 L.Ed.2d 434 (1985), quoting from *United States v. United States Gypsum Co.,* 438 U.S. 422, 438, 98 S.Ct. 2864, 2874, 57 L.Ed.2d 854 (1978). Several Supreme Court cases have so stated, and this seems to be beyond reasonable controversy. *See Liparota, supra; United States v. Bailey,* 444 U.S. 394, 406 n. 6, 100 S.Ct. 624, 633 n. 6, 62 L.Ed.2d 575 (1980); *United States v. United States Gypsum Co., supra. See also Morissette*

---

8. Subsequent Supreme Court references to *Freed* indicate that it is considered as establishing a *mens rea* requirement concerning knowledge of the relevant physical characteristics of the items possessed. Thus, in *United States v. International Minerals & Chemical Corp.,* 402 U.S. 558, 91 S.Ct. 1697, 1699, 29 L.Ed.2d 178 (1971), the Court observed: "Here as in *United States v. Freed* [citation], which dealt with the possession of hand grenades, strict or absolute liability is not imposed;...." If *Freed* sanctioned conviction for possession of a machinegun where the defendant reasonably believed that what he possessed was a conventional semi-automatic pistol, then it *would* have imposed strict liability. In *United States v. United States Gypsum Co.,* 438 U.S. 422, 436, 98 S.Ct. 2864, 2873, 57 L.Ed.2d 854 (1978), Justice Brennan's concurring opinion in *Freed* is cited in support of a *mens rea* requirement.

*v. United States,* 342 U.S. 246, 250, 72 S.Ct. 240, 243, 96 L.Ed. 288 (1952); LaFave & Scott, *Substantive Criminal Law* § 5.1 at 579 (1986) ("the absence of words in the statute requiring a certain mental state does not warrant the assumption that the legislature intended to impose strict liability; to the contrary, at least for an offense as serious as bigamy, it should be presumed that the legislature intended to follow the usual *mens rea* requirement 'unless excluded expressly or by necessary implication.' ") (footnote omitted.)

It is one thing for the Court to liken hand grenades to narcotics, as it did in *Freed;* quite another to draw such a parallel where ordinary skeet guns or target rifles are concerned. For the National Firearms Act does not treat conventionally manufactured, normal revolvers, semi-automatic pistols, hunting rifles, or shotguns as anything other than perfectly innocent, legal items. It does not purport to create any presumptions about any such items, or to regulate them in any manner. Common sense tells us that millions of Americans possess these items with perfect innocence. It is unthinkable to us that Congress intended to subject such law-abiding, well-intentioned citizens to a possible ten-year term of imprisonment if—unknown to them, and without reasonable cause on their part to think otherwise—what they genuinely and reasonably believed was a conventional semi-automatic pistol turns out to have worn down into or been secretly modified to be a fully automatic weapon.[9] In both *Liparota, supra,* and *United States Gypsum, supra,*—each of which were pure statutory offense cases—the Court reapproved Justice Jackson's famous

language in *Morissette,* 342 U.S. at 250, 72 S.Ct. at 243, that:

> The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil.

And in *Lambert v. California,* 355 U.S. 225, 229, 78 S.Ct. 240, 243, 2 L.Ed.2d 228 (1957), the Court, in striking down on due process grounds a strict liability offense, noted:

> As Holmes wrote in The Common Law, 'A law which punished conduct which would not be blameworthy in the average member of the community would be too severe for that community to bear.'

We think it far too severe for our community to bear—and plainly not intended by Congress—to subject to ten years' imprisonment one who possesses what appears to be, and what he innocently and reasonably believes to be, a wholly ordinary and legal pistol merely because it has been, unknown to him, modified to be fully automatic.[10] Certainly we have not done this for other offenses. Even for the *misdemeanor* offense of shooting over a baited field, *United States v. Delahoussaye,* 573 F.2d 910 (5th Cir.1978), we imposed a "should have known" standard respecting strict liability. And, in *United States v. Panter,* 688 F.2d 268 (5th Cir.1982), we created a self-defense exception to the offense of possession of a pistol by a felon, noting that criminal statutes should be interpreted " 'against a background of Anglo–Saxon common law' "—which certainly

---

**9.** Nothing in the legislative history suggests otherwise. Rather, it is quite clear that Congress was at great pains to *disclaim* the imposition of *any burden* on those who possessed ordinary firearms for hunting, self-protection, or the like. *See* Pub. Law 90–618, section 101, 82 Stat. 1213; Pub. Law 99–308, section 1(b), 100 Stat. 449.

**10.** We are puzzled in this regard by the dissenting opinion's reiterated references to a duty of inquiry. On p. 1261, for example, the opinion states that "the pertinent question is whether Congress intended to place on the owner a rea-

sonable duty of inquiry; by far the better view is that it did." Again on p. 1261, the dissent states that "a minimal burden of inquiry imposed upon the gun owner is a reasonable component of Congress's policy." The significant thing about these observations is that they are inconsistent both with our *Vasquez* decision, with the instructions given in this case, and with the government's litigating position here, none of which recognizes any sort of "reasonable inquiry" doctrine and each of which would impose strict felony liability whether or not the defendant acted reasonably.

requires *mens rea* for felonies—and that "[t]he government's theory of absolute liability ascribes to § 1202(a)(1) an effect 'more comprehensive than was contemplated and one inconsistent with our philosophy of criminal law.' *Morissette v. United States,* 342 U.S. at 250, 72 S.Ct. at 243." *Panter,* 688 F.2d at 271; *see also United States v. Boerner,* 508 F.2d 1064, 1067–68 (5th Cir.1975) (implying knowledge requirement in 8 U.S.C. § 1324(a)(1) offense). *Vasquez's* interpretation of the National Firearms Act is likewise "inconsistent with our philosophy of criminal law" and not within the intent of Congress.

### Stare Decisis

For the reasons stated above, we are satisfied that our *Vasquez* panel (a truly eminent one, but Horace advises us that Homer himself hath been observed to nod) misread *Freed* and laid down a rule unintended by Congress and incongruent with our Anglo–Saxon legal traditions. Our en banc court now addresses the issue for the first time.

In such circumstances, where a wrong turn has been taken, back is the shortest way forward. Only last spring, the Supreme Court overturned one of its own thirty-six year old statutory constructions because convinced it was a mistaken one. *Rodriguez de Quijas v. Shearson/American Express, Inc.,* — U.S. —, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989).[11] Nor has our en banc court hesitated to do so, *e.g. Bhandari v. First National Bank of Commerce,* 829 F.2d 1343 (5th Cir.1987), *vacated,* — U.S. —, 109 S.Ct. 3207, 106 L.Ed.2d 558 (1989), (overruling fifteen year old construction of 42 U.S.C. § 1981); *International Woodworkers of America v. Champion International Corporation,* 790 F.2d 1174, 1175–76, 1180–81 & n. 8 (5th Cir.1986), *aff'd sub nom. Crawford Fitting Co. v. J.T. Gibbons, Inc.,* 482 U.S. 437, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987) (overruling, in an opinion joined by ten of the presently active judges of this Court, at least four prior Fifth Circuit decisions construing 28 U.S.C. §§ 1821 & 1920 and 42 U.S.C. § 1988); *Sparks v. Duval County Ranch Co., Inc.,* 604 F.2d 976, 983 (5th Cir.1979), *aff'd sub nom. Dennis v. Sparks,* 449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980) (overruling several prior Fifth Circuit decisions on 42 U.S.C. § 1983 immunity).[12]

We overrule *Vasquez,* under which innocent possession of a worn or altered autoloader can result in jail time. Such a rule is unjust and dangerous, and there is little if any need for it. For in most cases, as in this one, *mens rea* will be proveable if it exists.[13]

---

**11.** In addition to the cases cited in *Rodriguez, supra, see also, e.g.,* the following decisions overruling prior holdings on issues of statutory construction: *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 2038, 56 L.Ed.2d 611 (1978); *Continental TV, Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977); *Peyton v. Rowe,* 391 U.S. 54, 88 S.Ct. 1549, 20 L.Ed.2d 426 (1968); *Nye v. United States,* 313 U.S. 33, 61 S.Ct. 810, 817, 85 L.Ed. 1172 (1941).

**12.** Moreover, post-*Vasquez* congressional silence is not of great significance, given the split in the circuits, the lack of authoritative Supreme Court guidance, and the fact that *Freed,* if anything, points away from *Vasquez.* Further, both citizen reliance and subsequent congressional inaction are of significantly diminished persuasiveness as bases for adhering to a prior decision where the challenge to that decision is that it expanded the scope of criminally proscribed conduct beyond that intended by the enacting congress. There are no federal common law crimes, and Congress may not retroactively expand the reach of criminal statutes.

**13.** Our dissenting siblings disagree, pointing out how greatly the prosecution is assisted in convicting persons accused of this felony if not required to prove state of mind and suggesting that establishing such a mental state may sometimes be difficult (Ms. op. 294). The first observation is undoubtedly true, but may be felt by some to prove too much: conviction of any felony—from murder on down—is facilitated by removing the intent element of proof.

As for the second suggestion, one found in possession of an automatic semi-automatic, like one found in possession of powdered cocaine, may decline to testify and argue through counsel that he did not know what it was that he had. Given that a jury can ordinarily infer knowledge of their nature from the possession of such illegal items and the surrounding circumstances, however, this seems a dangerous course of action and one likely to lead to conviction. Perhaps this is why such a contention rarely succeeds in narcotics cases.

*Conclusion*

Except as to the jury instruction on knowledge, we adopt the rulings of the panel opinion. As to it, we reverse Anderson's conviction and remand for further proceedings consistent with today's decision. It is so

ORDERED.

JERRY E. SMITH, Circuit Judge, with whom CLARK, Chief Judge, and REAVLEY, KING, JOHNSON, WILLIAMS, and DUHE, Circuit Judges, join, dissenting:

By adopting the defendant's position in this case, the majority has misread *United States v. Freed,* 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971), by relying upon a concurring opinion therein. I conclude, to the contrary, that the long-accepted interpretation of *Freed* made by this court in *United States v. Vasquez,* 476 F.2d 730 (5th Cir.), *cert. denied,* 414 U.S. 836, 94 S.Ct. 181, 38 L.Ed.2d 72 (1973), more faithfully adheres to *Freed*'s majority view. Even if this were not the case, the doctrine of *stare decisis* requires us, in this case of statutory construction, to adhere to our earlier holding absent compelling circumstances not demonstrated by this defendant or today's majority. Thus, I dissent from what I perceive to be a serious failure by this court to apply the Supreme Court's pronouncements regarding *stare decisis* and the legal process.

I.

A close reading of *Freed* convinces me that the Court purposefully eschewed interpreting the act to require knowledge of a weapon's characteristics. In comparing the Act with other public-welfare statutes importing criminal penalties, the Court quoted from Justice Frankfurter's opinion in *United States v. Dotterweich,* 320 U.S. 277, 284, 64 S.Ct. 134, 138, 88 L.Ed. 48 (1943), upholding a conviction under the Food and Drug Act " 'though consciousness of wrong-doing be totally wanting.' " 401 U.S. at 609, 91 S.Ct. at 1118. The Court also noted that in *United States v. Balint,* 258 U.S. 250, 254, 42 S.Ct. 301, 303, 66 L.Ed. 604 (1922), it had reasoned, similarly, that the Narcotic Act's " 'manifest purpose is to require every person dealing in drugs to ascertain at his peril whether that which he sells comes within the inhibition of the statute, and if he sells the inhibited drug *in ignorance of its character,* to penalize him.' " 401 U.S. at 609, 91 S.Ct. at 1118 (emphasis added). The *Balint* Court had surmised that "[C]ongress weighed the possible injustice of subjecting an innocent seller to a penalty against the evil of exposing innocent purchasers to danger from the drug, and concluded that the latter was the result preferably to be avoided." *Freed, id.* (quoting *Balint,* 258 U.S. at 254, 42 S.Ct. at 303). The *Freed* Court adopted this reasoning *verbatim* with respect to the Act. *Id.* 401 U.S. at 609–10, 91 S.Ct. at 1118–19.

Given this language, I must conclude today, as this court did sixteen years ago in *Vasquez,*[1] that there is no requirement of proving knowledge of a weapon's specific characteristics. Justice Brennan's concurrence in *Freed,* relied upon by the majority, is just that, a concurrence: It sets out the law as he believes it should be but neither represents nor clarifies the majority view.[2] It is a "strange practice to seize upon passages from such a writing—a mere expression of additional views ...—and found a decision upon them." *United States v. Edwards,* 554 F.2d 1331, 1340 (5th Cir.1977) (Gee, J., dissenting), *vacated,* 577 F.2d 883 (5th Cir.), *cert. denied,* 439 U.S. 968, 99 S.Ct. 458, 58 L.Ed.2d 427 (1978).

---

1. References hereinafter to "Vasquez" are to *United States v. Vasquez,* not *Vasquez v. Hillery,* 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986), discussed *infra* as part of the *stare decisis* analysis.

2. *Accord, United States v. Cowper,* 503 F.2d 130, 132 n. 2 (6th Cir.1974) ("The majority opinion [in *Freed* ], however, which had eight votes, is controlling."), *cert. denied,* 420 U.S. 930, 95 S.Ct. 1133, 43 L.Ed.2d 403 (1975). In *Freed,* Justice Brennan specifically stated, "I do not join part II of the opinion; although I reach the same result as the Court on the intent the Government must prove to convict, I do so by *another route.*" 401 U.S. at 610, 91 S.Ct. at 1118–19 (emphasis added) (Brennan, J., concurring).

The majority attaches special significance to the fact that *Vasquez* requires knowledge that a weapon is a firearm in a general sense instead of imposing strict liability. The majority asserts that it is anomalous to use a general notion of "firearm" as the standard where the Act explicitly defines that term in a manner that would exclude many weapons (such as revolvers and hunting rifles) and include many others (such as silencers and landmines) that are not commonly thought of as firearms.

While this argument has some merit, it should not ultimately be persuasive, as it does not properly take account of the implications of *Freed:* There, the Court concluded that the possession of a hand grenade, given its obvious dangers, was sufficient to dispense with any knowledge requirement that such weapon was unlawfully possessed. In *Vasquez,* we used the same reasoning to accommodate the case of machine guns: The knowing possession of a gun, given its inherent dangers and the frequency of regulation under state and federal law, was considered sufficient to impose upon defendant the burden of ascertaining both the true character of his weapon *and* whether it is of the type that must be registered.

The only material difference between *Freed* and *Vasquez* is that in the former, no argument was made that that defendant legitimately could have mistaken the hand grenades for something that could be lawfully owned without registration. The Court reasoned, in part, that hand grenades could not reasonably be taken for something else and that awareness of their inherent dangers sufficed to charge the possessor with knowledge of the Act's provisions. Here and in *Vasquez,* however, the subject automatic pistols, at least superficially, could have been confused, by a reasonable person, with the lawful, semi-automatic variety. Accordingly, defendant argues that the possession that might be sufficient to charge knowledge in the case of grenades is not satisfied in the case of machine guns by knowledge that a pistol is a firearm in the general sense. I disagree.

I begin by noting that it is possible, although admittedly less likely, to possess a grenade innocently, thinking it is a toy or a replica, in the same sense that is possible to possess a machine gun thinking that it is a semi-automatic pistol. In the former situation, the Court in *Freed* impliedly determined that the indications, to a possessor, that a grenade is a grenade and is a highly dangerous weapon, the possession of which might be unlawful, overcame any concern for convicting the innocent possessor. In the instant case, the rule in *Vasquez* comprehends that ownership of semi-automatic weapons, although lawful, carries with it the responsibility to be aware of their characteristics.

Handguns that are not subject to the Act nevertheless are subject to other forms of federal, state, and local regulation.[3] Owners of such weapons should be aware generally that there may be laws affecting their rights of ownership. Given this presumed awareness, *Vasquez* properly follows the logic of *Freed* in requiring gun owners to know what their weapons are about or face possible penalties for their ignorance. The likelihood of such ignorance in the case of machine gun owners is not enough greater than in the case of grenade owners to call for different rules. And in both circumstances, confusion is improbable.

In an effort to put a wedge between *Freed* and *Vasquez,* the majority lamely asserts that the two opinions address different issues. But nothing supports that contention except the majority's *ipse dixit:* In each case, the question is whether a defendant who knew that he actually possessed a particular thing must also know that that thing was an item required by federal law to be registered. The difference between *Freed* and *Vasquez* is one of degree, not kind. I acknowledge that it is *more* likely that a person possessing a grenade will understand that he owns something that is subject to regulation; but such likelihood as applied to grenades

---

**3.** *See, e.g.,* 18 U.S.C. §§ 921–928; Tex. Penal Code Ann. §§ 46.01–46.04 (Vernon 1989).

does not exclude the likelihood that owners of certain other types of dangerous weapons will have the same understanding, or that charging them with that knowledge is somehow unfair.

In any event, if this court in *Vasquez* misread *Freed* in the manner suggested by the majority, so have virtually all of our sister circuit courts that have addressed this issue. Those circuits have interpreted *Freed* similarly and have adopted rules almost identical to that of *Vasquez.* In *United States v. DeBartolo,* 482 F.2d 312, 316 (1st Cir.1973), for example, the court held that the defendant's knowledge that he possessed a gun in the general sense sufficed to meet any *mens rea* requirement under the Act, even without knowledge that his shotgun had been modified so as to qualify as a firearm under the Act.[4] As here, the defendant lawfully could have possessed the weapon but for the modifications bringing it under the Act.

In only requiring proof that the defendant knew the shotgun to be a generic firearm, *DeBartolo* referred to *Freed*'s discussion of the special status of regulatory offenses and concluded, as we did in *Vasquez,* that "[t]he government need not prove that a defendant knows he is dealing with a ... weapon possessing every last characteristic which subjects it to regulation." *DeBartolo, id.* at 315.

> It is enough to prove he knows that he is dealing with a dangerous device of such type as would alert one to the likelihood of regulation. If he has such knowledge, and if the particular item is in fact regulated, he acts at his peril. A shotgun in today's society plainly falls into this category. One knowingly participating in the sale of such a lethal instrumentality cannot escape liability by failing to inspect the length of its barrel any more than by failing to inquire whether it is registered. In *Freed,* it is true, the court assumed that the Government would have to prove that the defendant knew the grenade was a grenade, hence a 'firearm'. Because all grenades are classified as 'firearms', the issue never arose whether knowing possession of a grenade would give rise to a duty to inspect to see if it was the kind of grenade regulated. But we see no difference in rationale between the duty of one possessing a grenade to ascertain if it is registered, and of one, knowingly transferring a shotgun, to ascertain if by reason of its barrel length it must be registered.

*Id.* at 316–17 (citations omitted).[5]

As of the time this matter was submitted en banc, only in *United States v. Herbert,*

---

4. Shotguns with barrels less than 18 inches in length are covered under the Act. § 5845(a)(1).

5. *Accord, United States v. Mittleider,* 835 F.2d 769, 774 (10th Cir.1987) ("The offenses with which defendant was charged were not specific intent crimes, and the government was not required to prove either that he knew that possession of the weapon was against the law or that registration of the weapon was required."), *cert. denied,* — U.S. —, 108 S.Ct. 1279, 99 L.Ed.2d 490 (1988); *United States v. Shilling,* 826 F.2d 1365, 1368 (4th Cir.1987) (rejecting "appellant's contention that the Government must prove actual knowledge of a weapon's characteristics"), *cert. denied,* — U.S. —, 108 S.Ct. 777, 98 L.Ed.2d 863 (1988); *United States v. Taylor,* 728 F.2d 864, 867–70 (7th Cir.1984) ("Accordingly, proof that a person actually or constructively possessed the unregistered firearm, in violation of 26 U.S.C. section 5861(d), is sufficient proof that the person 'knowingly possessed' the unregistered firearm in question."); *United States v. Gonzalez,* 719 F.2d 1516, 1522 (11th Cir.1983) (holding that "the government does *not* have to prove that the defendant knew that the weapon in his possession was a 'firearm' within the meaning of the statute, or that he knew registration was required") (emphasis in original), *cert. denied,* 465 U.S. 1037, 104 S.Ct. 1312, 79 L.Ed.2d 710 (1984); *Morgan v. United States,* 564 F.2d 803, 806 (8th Cir.1977) ("In concluding that it need not be proved that Morgan had actual knowledge that the M16 was designed to fire automatically or semiautomatically, we approve a rationale now accepted by several courts of appeal."); *United States v. Ranney,* 524 F.2d 830, 832 (7th Cir.1975) (proof that defendant "knew that he possessed a firearm in the general meaning of the term was sufficient"), *cert. denied,* 424 U.S. 922, 96 S.Ct. 1130, 47 L.Ed.2d 330 (1976); *United States v. Cowper,* 503 F.2d at 132 (*Freed* does not require knowledge that firearm is automatic rifle); *United States v. Decker,* 292 F.2d 89, 90 (6th Cir.) ("It is not necessary for the government to prove that defendant knew that the weapon in his possession was a firearm within the meaning of the statute. Scienter is not involved."), *cert. denied,* 368 U.S. 834, 82 S.Ct. 58, 7 L.Ed.2d 36 (1961).

698 F.2d 981 (9th Cir.), *cert. denied,* 464 U.S. 821, 104 S.Ct. 87, 78 L.Ed.2d 95 (1983), had a court of appeals fashioned a rule contrary to *Vasquez.* There, the court created a limited exception to the general rule of not having to prove knowledge of a weapon's characteristics. The exception extends only to guns that otherwise may be lawfully possessed but have been *internally* modified so as to become "firearms" under the Act. The *Herbert* court perceived a meaningful difference between readily observable and purely internal modifications because, in the latter situation, the defendant does not know " 'that he is dealing with a dangerous device of such type as would alert one to the likelihood of regulation.' " *Id.* at 986 (quoting *DeBartolo,* 482 F.2d at 316).

As the majority notes, the Sixth Circuit, departing from its opinions in *Decker* and *Cowper,* recently has sided with *Herbert* in *United States v. Williams,* 872 F.2d 773 (6th Cir.1989). As for prior Sixth Circuit cases, the opinion mentions but does not attempt to distinguish *Decker, see id.* at 775 n. 2, and dismisses *Cowper* as *dictum, see id.* at 777.

The reasoning in *Herbert* and *Williams* is unpersuasive. By the logic of *Freed* and *DeBartolo,* possession of a gun constitutes possession of a dangerous weapon that, even if completely lawful, alerts one to the likelihood of regulation. *Herbert* and *Williams,* on the other hand, appear completely to excuse the possessor where the modifications to the weapon are purely internal. According to that reasoning, a shotgun that has been cut off so as to be a fraction of an inch too short and hence just barely a "firearm" under the Act would not be subject to proof of knowledge of its characteristics, even though a person possessing it might easily be unaware of the unlawful condition; but a semi-automatic pistol that had been internally modified so as to become a machine gun would require

such proof simply because the modification is not superficially discernable. Moreover, to fashion a distinction based upon the external visibility of the modification is to engage in legislative line-drawing more befitting Congress than the courts.

I would decline the argument that separate rules are justified on this basis and conclude that the holdings in *Herbert* and *Williams* rely upon a distinction without a difference. The better view, instead, is to adhere to *Vasquez* and to most other circuits' reading of the Act rather than to fashion an exception to cover the instant facts.[6]

## II.

The majority suggests that *Vasquez* improperly dispenses with the venerable common-law tradition of requiring *mens rea* for felony offenses. I readily acknowledge the well-established principle of *mens rea;* I note, as well, that the Supreme Court, as a matter of statutory interpretation, often reads a *mens rea* requirement into a statutory offense where none is provided. *E.g., Liparota v. United States,* 471 U.S. 419, 425–26, 105 S.Ct. 2084, 2087–88, 85 L.Ed.2d 434 (1985); *United States v. United States Gypsum Co.,* 438 U.S. 422, 438–43, 98 S.Ct. 2864, 2874–77, 57 L.Ed.2d 854 (1978).

However, these considerations are inapposite to this court's reconsideration of *Vasquez.* First of all, as noted above, *Vasquez* does require *mens rea* to the extent that a defendant must realize that his or her weapon is a firearm in the general sense. Moreover, the Court in *Freed* directly addressed whether to read a stricter culpability requirement into the Act when it analogized that case to its earlier decisions in *Dotterweich* and *Balint* involving other public-welfare statutes. The certain thrust of the Court's reasoning is that irrespective of common-law tradition, regulatory offenses where the act in question is

---

**6.** Except for *Williams* and today's majority, all of the courts that subsequently have addressed this issue have either rejected or criticized *Herbert. E.g., Mittleider,* 835 F.2d at 774 (concluding that "the rationale underlying the court's holding in *Herbert* is of questionable validity");

*Shilling,* 826 F.2d at 1368 ("We decline to follow the *Herbert* decision in this Circuit."). While this court is not bound to follow the law of other circuits, I think it significant that the weight of such authority so overwhelmingly supports upholding the rule in *Vasquez.*

unequivocally prohibited do not require the same magnitude of fault in order to justify a felony conviction. Thus, it is the extent of *mens rea,* and not its existence *vel non,* which we should determine here, as we did in *Vasquez.*

Although the majority apparently does not dare to make a due process challenge to the instant conviction, the defendant suggests that convicting an individual for possession of a weapon without having to prove that such person knew what the weapon was may violate due process. I cannot agree. Shortly after deciding *Freed,* the Court considered the proper *mens rea* for the offense of unlawfully shipping sulfuric acid. In *United States v. International Minerals & Chem. Corp.,* 402 U.S. 558, 564–65, 91 S.Ct. 1697, 1701–02, 29 L.Ed.2d 178 (1971), the Court referred to *Freed* and to *Balint,* involving the illegal sale of narcotics, in rejecting a due process challenge based upon the lack of sufficient *mens rea* requirements. The Court reasoned as follows:

> In *Balint* the Court was dealing with drugs, in *Freed* with hand grenades, in this case with sulfuric acid and other dangerous acids. Pencils, dental floss, paper clips may also be regulated. But they may be the type of product which might raise substantial due process ques-

tions if Congress did not require … *'mens rea'* as to each ingredient of the offense. But where, as here and as in *Balint* and *Freed,* dangerous or deleterious devices or products or obnoxious waste materials are involved, the probability of regulation is so great that anyone who is aware that he is in possession of them or dealing with them must be presumed to be aware of the regulation.

As discussed *supra,* I conclude, as the court should, that guns, even if they may in some instances be owned lawfully without registration, qualify as sufficiently "dangerous or deleterious devices" so as to require individuals to be aware of their characteristics and the possibility of their inclusion under the Act. Possessing a semi-automatic pistol is surely not the equivalent of possessing pencils, paper-clips, or dental floss.

Moreover, aside from the easy conclusion that the rule in *Vasquez* satisfies due process, this court's only proper charge here is to interpret Congressional intent in the light of the underlying goals of the Act. I conclude, consistently with *Vasquez,* that the Act was intended to control traffic in firearms without placing an undue burden upon those wishing to use firearms for lawful purposes.[7] As it is the role of Con-

---

7. Similarly, in *Balint,* as I have noted, the Supreme Court concluded that "Congress weighed the possible injustice of subjecting an innocent seller to a penalty against the evil of exposing innocent purchasers to danger from the drug, and concluded that the latter was the result preferably to be avoided." 258 U.S. at 254, 42 S.Ct. at 303.

The majority concludes that Congress could not possibly have intended the result reached in *Vasquez.* While there is no legislative history directly on point, this bald assertion is undermined by a review of associated legislative actions indicating that *Vasquez* is entirely consistent with Congress's express and implicit purposes in its regulation of automatic weapons. The 1986 revisions to the Gun Control Act were entitled the Firearms Owners' Protection Act, P.L. 99–308. These amendments, *inter alia,* added scienter requirements to parts of 18 U.S.C. §§ 922 and 924. Despite its clear general intention to protect gun owners' interests, Congress did not see fit to add any *mens rea* component to § 5861(d).

To the contrary, § 104 of the Firearms Owners' Protection Act reveals exactly the opposite

intention with respect to machine guns. Subsection (a) created additional penalties for possession of machine guns while committing violent or drug-related crimes. Even more to the point, § 101, by incorporation of the definition appearing in § 5845(b) of title 26 U.S.C., broadened the definition of machine gun in the Gun Control Act to include machine gun parts and conversion kits. Citing the Report of the Attorney General's Task Force on Violent Crime, the legislative history to this subsection reveals a clear recognition of, and desire to curb, "the easy conversion of semi-automatic weapons into fully automatic weapons." H.R. No. 495, 99th Cong., 2d Sess., *reprinted in* 1986 U.S.Code Cong. & Ad.News 1327, 1354.

The Attorney General's Report in turn refers to 1981 statistics indicating that approximately 20% of illegal machine guns were converted semi-automatic weapons. Recommendation 20, *Final Report of the Attorney General's Task Force on Violent Crime* 29, 32 (United States Dep't of Justice Aug. 17, 1981) (citing Dep't of the Treasury, Bureau of Alcohol, Tobacco & Firearms, *Firearms Case Summary* (Washington: U.S. Gov't Printing Off.1981)). I cannot help but

gress, not the courts, to make that policy determination, it is useful to examine whether the burden which we imposed upon the gun owner in *Vasquez* is greater than that which Congress reasonably may have intended in effecting its intent.

At the outset, it appears extremely unlikely that anyone could unwittingly possess a machine gun believing it to be a semi-automatic pistol. If a gun is purchased through proper lawful channels, such as from a reputable sporting goods store, the possibility of its being automatic is remote. Such guns presumably become automatic in the vast majority of cases because, as apparently with defendant Anderson, they are modified sometime after the initial lawful purchase; hence, it is perfectly reasonable to assume that the owners are well aware of their characteristics without the need for specific proof. One may reliably infer that in most such instances the owners either modified their weapons themselves or deliberately purchased them that way. And in the instance of a street purchaser of a gun, the suspicious circumstances should more than suffice to put him or her on notice that there may be legal problems with the weapon.

There is always, of course, the scant possibility that a truly innocent purchaser will not realize that a weapon is automatic. This arguably was the case in *Williams,* where the defendant, licensed to sell semi-automatic rifles, sold automatic weapons which he had never unpacked or examined and claimed that he was unaware of their automatic characteristics. But again, the pertinent question is whether Congress intended to place on the owner a reasonable duty of inquiry; by far the better view is that it did.

An additional concern that *Vasquez* may subject innocent persons to serious criminal penalties stems from the possibility, noted by the majority, that certain semi-automatic pistols apparently may become automatic by accident as a result of wear and tear on their mechanisms. I do not suggest that Congress intended the draconian result of convicting such law-abiding citizens without some showing of fault beyond the knowledge that they owned a perfectly lawful firearm. However, the answer again is that a minimal burden of inquiry imposed upon the gun owner is a reasonable component of Congress's policy of limiting firearms traffic.

The results of Congress's policy choice in fashioning the Act appear to have been salutary and (more importantly for present purposes) devoid of unfair consequences to innocent persons. Even were this not so, it would not be this court's proper role to alter that legislative policy. I note, nonetheless, that with the possible exception of *Williams,* I am unaware of any case in the long history of the Act involving the prosecution of a truly "innocent" gun owner. Thus, any possibility that the statute will be misused is indeed remote; at oral argument, defendant's counsel admitted that he could point to no historical instance of such a prosecution.

Instead, the Act comes into play primarily in combating the illegal arms trade where the players are typically gangsters, soldiers of fortune, or terrorists, and increasingly, in prosecuting inner-city drug dealers whose prestige, and ability to compete with rivals, demand that they carry automatic weapons.[8] Thus, the majority's

---

note that this percentage has likely increased, perhaps markedly, as a result of the tragic and well-documented proliferation, among criminals over the past several years, of easily-convertible "assault rifles." *See infra* n. 14.

The above materials are not dispositive of whether *Vasquez* was correctly decided. However, they more than establish that the rule of that case comports with the attitude expressed by Congress three years ago when it globally reviewed the question of federal firearms regulation with the intention of protecting lawful gun owners, and in so doing specifically con-

sidered the issue of the conversion of semi-automatic weapons, with the intention of eradicating this problem. The majority's suggestion that Congress could not have intended the result reached by *Vasquez* hence is without support.

**8.** The Congressional purpose in the initial enactment of the firearm registration requirement was "to make it more difficult for the gangster element to obtain certain types of firearms." *Sipes v. United States,* 321 F.2d 174, 176 (8th Cir.) (quoting the legislative history) (cited in *Freed,* 401 U.S. at 607, 91 S.Ct. at 1117), *cert.*

suggestion "that law-abiding, well-intentioned citizens" could be unfairly prosecuted—despite the dearth of such prosecutions over the long history of the act—is at best hyperbole and at worst unwarranted hysteria.

To the contrary, I fail to see how the innocent gun owner gets swept up in this enforcement scheme. In any event, it stands to reason that only frequently-used guns could become modified through wear on the mechanism; such weapons presumably would be fired by experienced shooters who would know immediately upon next discharging them that they had become fully automatic. Thus, the ultimate burden imposed upon gun owners by *Vasquez*'s reading of Congressional intent is the duty to test-fire their weapons or have them examined by an expert. It may be true that the typical non-expert cannot easily tell by looking at a pistol whether it has been internally modified, but surely anyone who actually shoots a gun will know, immediately upon firing, that it is automatic.

### III.

Having concluded that *Vasquez* neither raises colorable due process concerns nor poses a realistic chance of imposing criminal liability upon innocent individuals, I now turn briefly to a discussion of the benefits flowing from the no-specific-knowledge rule which the court today rejects. Its primary virtue is that it appreciably facilitates enforcement of the Act by eliminating the reasonable-doubt-as-to-knowledge loophole that otherwise could be exploited. In the case here of defendant Anderson, the government probably could have obtained a conviction for possession of at least one of the pistols even under a specific-knowledge rule, as the gun was found accompanied by a weapon-modification manual. However, in evaluating the effect of the rule, it is best to look at the typical case rather than at the instant facts.

Where law enforcement officials find only weapons, unaccompanied by corroborating evidence such as the modification

manual found here, it may be difficult to prove the possessor's knowledge of the weapon's characteristics. The defendant may not testify, or may testify that he or she was unaware that the guns were automatic. The prosecution then would depend upon circumstantial inferences that may be difficult to establish beyond a reasonable doubt. In such cases, the will of Congress to control the possession of crime-facilitating dangerous firearms will be unduly thwarted by virtue of today's ruling.

In assessing the implications of the majority opinion, one is left with a balancing of two factors: the illusory negative impact of *Vasquez* upon law-abiding gun owners versus the decreased law-enforcement effectiveness of abandoning this rule. Because I believe that the first factor is negligible, while the second is a real and increasingly penetrating concern, I would hold that the rule which we established sixteen years ago in *Vasquez* is not only supportable as a matter of law, but as a practical matter has yielded a salutary result consistent with the design of Congress.

### IV.

*Vasquez* has been on the books for sixteen years. The rule established by that case is both useful and fair. At the very least, it represents a constitutional and plausible interpretation of the Act. Accordingly, out of respect for the judicial process that produced *Vasquez* and its progeny, and as a matter of adherence to the well-established doctrine of *stare decisis,* I would be reluctant to overturn such a rule even if defendant's arguments against it were stronger.

In my view, the most distressing aspect of today's decision is its failure to recognize the importance of *stare decisis* in cases such as this. Yet remarkably, the majority devotes only a few cursory sentences to this maxim. It is clear from that truncated treatment that the majority views *stare decisis* not as a basic tenet of the legal method but simply as a matter of

*denied,* 375 U.S. 913, 84 S.Ct. 208, 11 L.Ed.2d   150 (1963).

convenience—or like a flag to be raised high in the sunshine and taken down in the rain.

Only when presented with a compelling constitutional attack or dire practical ramifications do we readily overturn well-established precedent. As Judge Higginbotham of this court recently observed, "Courts must be particularly circumspect in reconsidering decisions interpreting statutes." *Bhandari v. First National Bank of Commerce*, 829 F.2d 1343, 1353 (5th Cir.1987) (en banc) (Higginbotham, J., concurring), *vacated,* —— U.S. ——, 109 S.Ct. 3207, 106 L.Ed.2d 558 (1989).[9] In this case, defendant's constitutional case based upon due process is dubious. His best arguments that *Vasquez* was wrongly decided are, firstly, that it is anomalous to impose only a requirement of knowledge that a weapon is a generic firearm under a statute that explicitly defines this term in an unusual manner and, secondly, that the case arguably misinterprets *Freed.* However, these assertions relate to statutory interpretation and sound in an arena where we should be much less likely to abandon our prior interpretation.

In *Vasquez v. Hillery*, 474 U.S. 254, 265–66, 106 S.Ct. 617, 624, 88 L.Ed.2d 598 (1986), one of its more recent expressions on *stare decisis*, the Court set forth some general principles that should have guided this court's disposition of the instant case. The Court described *stare decisis* as "the means by which we ensure the law will not merely change erratically, but will develop in a principled and intelligent fashion." The Court continued at length,

That doctrine permits society to presume that bedrock principles are founded in the law rather than in the proclivities of individuals, and thereby contributes to the integrity of our constitutional system of government, both in appearance and in fact. While *stare decisis* is not an inexorable command, the careful observer will discern that any detours from the straight path of *stare decisis* in our past have occurred for articulable reasons, and only when the Court has felt obliged 'to bring its opinions into agreement with experience and with facts newly ascertained' [citing *Burnet*, 285 U.S. at 412, 52 S.Ct. at 449 (Brandeis, J., dissenting)].

Our history does not impose any rigid formula to constrain the Court in the disposition of cases. Rather, its lesson is that every successful proponent of overruling precedent has borne the heavy burden of persuading the Court that changes in society or in the law dictate

---

**9.** The Supreme Court has long acknowledged a difference in its attitude toward precedent where it is presented with a constitutional question rather than one of statutory interpretation. Justice Brandeis, in his dissent in *Burnet v. Coronado Oil & Gas Co.*, 285 U.S. 393, 405–06, 52 S.Ct. 443, 446–47, 76 L.Ed. 815 (1932) (Brandeis, J., dissenting), surmised that "in most matters it is more important that the applicable rule of law be settled than that it be settled right" (quoted approvingly in, e.g., *United States v. Dayton*, 592 F.2d 253, 256 n. 1 (5th Cir.1979) (per curiam)) but that "in cases involving the Federal Constitution, where correction through legislative action is practically impossible, this Court has often overruled its prior decisions." Later, in his celebrated opinion in *Erie R.R. v. Tompkins*, 304 U.S. 64, 77–78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938), Justice Brandeis remarked, "[i]f only a question of statutory construction were involved, we would not be prepared to abandon a doctrine so widely applied throughout nearly a century. But the unconstitutionality of the course pursued has now been made clear and compels us to do so."

Justice Brandeis's dissent in *Burnet* was the seminal expression of what is now the generally-accepted notion that *stare decisis* weighs more heavily in statutory than in constitutional adjudication; we have accepted his view repeatedly, e.g., *Rios v. Dillman*, 499 F.2d 329, 334 n. 8 (5th Cir.1974), although the distinction has been subject to some criticism. *See* Easterbrook, *Stability & Reliability in Judicial Decisions*, 73 Cornell L.Rev. 422 (1988) (but acknowledging the prevalence of the constitutional/statutory distinction). *But see* Levi, *An Introduction to Legal Reasoning*, 15 U.Chi.L.Rev. 501 (1948) (supporting the predominant rule).

Thus, in general the Supreme Court has long afforded what might be described as an extremely strong presumption of correctness to its decisions concerning statutory interpretation. *See Toolson v. New York Yankees, Inc.,* 346 U.S. 356, 356–57, 74 S.Ct. 78, 79, 98 L.Ed. 64 (1953) (per curiam); *United States v. South Buffalo Ry.,* 333 U.S. 771, 68 S.Ct. 868, 92 L.Ed. 1077 (1948); *Helvering v. Griffiths,* 318 U.S. 371, 63 S.Ct. 636, 87 L.Ed. 843 (1943); *see generally* Eskridge, *Overruling Statutory Precedents,* 76 Geo.L.J. 1361 (1988).

that the values served by *stare decisis* yield in favor of a greater objective.

*Id.* (citation omitted). The Court concluded that it would not break with a well-established rule of law unless it is "outdated, ill-founded, unworkable, or otherwise vulnerable to serious reconsideration." *Id.* 474 U.S. at 266, 106 S.Ct. at 625.

More significantly, the Supreme Court—in an opinion issued subsequently to oral argument herein—has reiterated the compelling role of *stare decisis* in cases of statutory construction. In *Patterson v. McLean Credit Union,* —— U.S. ——, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), the Court had directed reargument on the question of whether to overrule *Runyon v. McCrary,* 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976), involving the construction of 42 U.S.C. § 1981. Declining to overrule *Runyon,* the Court noted that " 'the doctrine of *stare decisis* is of fundamental importance to the rule of law.' " 109 S.Ct. at 2370 (quoting *Welch v. Texas Dep't of Highways & Pub. Transp.,* 483 U.S. 468, 494, 107 S.Ct. 2941, 2956–57, 97 L.Ed.2d 389 (1987)). "*[S]tare decisis* is a basic self-governing principle within the Judicial Branch, which is entrusted with the sensitive and difficult task of fashioning and preserving a jurisprudential system that is not based upon 'an arbitrary discretion.' " *Id.* (quoting *The Federalist* No. 78, at 490 (A. Hamilton) (H. Lodge ed. 1988)).

Importantly for the instant case, the Court observed, consistently with Justice Brandeis's view in *Burnet,* that

> the burden borne by the party advocating the abandonment of an established precedent is greater where the Court is asked to overrule a point of statutory construction. Considerations of *stare*

*decisis* have special force in the area of statutory interpretation, for here, unlike in the context of constitutional interpretation, the legislative power is implicated, and Congress remains free to alter what we have done.

*Id.* (citations omitted).

The Court found no "special justification" for overruling *Runyon,* noting that "[i]n cases where statutory precedents have been overruled, the primary reason for the Court's shift in position has been the intervening development of the law, through either the growth of judicial doctrine or further action taken by Congress." *Id.* The Court reasoned that *stare decisis* can be overridden (i) where "later law has rendered the decision irreconcilable with competing legal doctrines or policies"; (ii) where there is "inherent confusion created by an unworkable decision"; (iii) where "the decision poses a direct obstacle to the realization of important objectives embodied in other laws"; or (iv) where the precedent has been " 'tested by experience [and] has been found to be inconsistent with the sense of justice or with the social welfare' " (quoting *Runyon,* 427 U.S. at 191, 96 S.Ct. at 2604 (Stevens, J., concurring) (quoting B. Cardozo, *The Nature of the Judicial Process* 149 (1921))). *Id.* 109 S.Ct. at 2371. Thus, the Court concluded that "whether or not *Runyon* was correct as an initial matter, there is no special justification for departing here from the rule of *stare decisis.*" *Id.* at 2372 n. 1.

We are, of course, less free to break with the past than is the Supreme Court, as we are bound by that Court's opinions. Subject thereto, it seems that we should adhere generally to the same constraints of *stare decisis* which the Court acknowledges.[10] If

---

**10.** Another circuit has spoken convincingly of the proper constraints upon an en banc court of appeals:

> ... The Court en banc is not, of course, bound by prior opinions of panels. We have both the power and the right, in appropriate cases, to overrule panel opinions. This power, however, should be exercised sparingly and with great caution, especially ... when the issue is one of statutory construction, the kind of question on which Congress can easily correct us if it wishes. See, *e.g., Cottrell v.*

*Commissioner,* 628 F.2d 1127, 1131 (8th Cir. 1980) (en banc): 'The doctrine of *stare decisis,* weighty in any context, is especially so in matters of statutory construction. For in such cases Congress may cure any error made by the courts. Until it does, the bar and the public are justified in expecting the courts, except in the most egregious cases, neither to depart, nor to give them a grudging application' (footnote omitted).
*Fast v. School Dist. of the City of Ladue,* 728 F.2d 1030, 1034 (8th Cir.1984) (en banc).

we were to apply these principles to the instant case, *stare decisis* would require that we leave *United States v. Vasquez* intact. As a preliminary matter, I note that the rule of *Vasquez* is about as well established as a precedent concerning an infrequently-arising point of statutory interpretation is likely to become. That case was decided in 1973 shortly after, and in reliance upon, the Court's decision in *Freed.* Since that time, circuit after circuit has adopted the same or a similar analysis.

Furthermore, despite this development of authority primarily along the lines of *Vasquez,* the Court has given no indication that any of these cases has either misconstrued *Freed* or presented other problems of statutory interpretation. The issue certainly has had time to ferment among the courts of appeals. I therefore consider the nearly unanimous movement in the direction of *Vasquez,* and the Supreme Court's attendant silence, as an indication that the case was rightly decided and that the law on

this point has been settled and should not be disturbed absent the sort of "special justification" described in *Patterson.* Here defendant does not, and cannot plausibly, contend that either society or the law has in fact changed so as to justify the abandonment of *stare decisis* in favor of adopting a new rule.[11]

This is not to say that *stare decisis* should be viewed as talismanic in every case, and there are circumstances in which we do, and should, reject its application as inappropriate—as, for example, when the established rule has proven to be "outdated, ill-founded, unworkable, or otherwise vulnerable to serious reconsideration." *Vasquez v. Hillery,* 474 U.S. at 266, 106 S.Ct. at 625.[12] Thus, as "[o]ur law is neither moribund nor muscle-bound[,] [t]here are justifiable escapes and liberations from the rigidities and inflexibilities of stare decisis," as when rules " 'are found after fair trial to be inconsistent ... with an attainment of the ends which law is meant to

**11.** Moreover, there is a colorable argument that reversing a well-established point of statutory interpretation that builds upon the bare bones of a statute presents constitutional separation-of-powers problems, as any subsequent change of position has the practical effect of amending the statute, an act that is legislative rather than judicial in nature. *See Francis v. Southern Pac. Co.,* 333 U.S. 445, 450, 68 S.Ct. 611, 613, 92 L.Ed. 798 (1948); *Boys Markets, Inc. v. Retail Clerks Union,* 398 U.S. 235, 257–58, 90 S.Ct. 1583, 1595–96, 26 L.Ed.2d 199 (1970) (Black, J., dissenting); *United Gas Improvement Co. v. Continental Oil Co.,* 381 U.S. 392, 406, 85 S.Ct. 1517, 1525, 14 L.Ed.2d 466 (1965) (Douglas, J., dissenting); *see generally* Horack, *Congressional Silence: A Tool of Judicial Supremacy,* 25 Tex.L.Rev. 247 (1947).

**12.** The majority correctly notes that only a month before deciding *Patterson,* the Supreme Court overruled one of its prior statutory-construction opinions in *Rodriguez de Quijas v. Shearson/American Express, Inc.,* — U.S. —, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989). But that case, unlike the case *sub judice,* amply satisfies *Patterson's* "special justification" requirement: The court concluded that the earlier precedent should be overruled "to achieve a uniform interpretation of similar statutory language ... and to correct a seriously erroneous interpretation of statutory language that would undermine congressional policy as expressed in other legislation...." *Id.* 109 S.Ct. at 1922. I note, as well, that Justice Kennedy authored the majority opinions in both *Rodriguez de Quijas* and *Patterson.*

I find it nothing short of bizarre that the majority has cited *Bhandari v. First Nat'l Bank of Commerce* (Gee, J.) as an example of this court's overruling of statutory precedent. That case indeed is an example of a recent denigration of *stare decisis,* but apparently the Supreme Court found it in error: The judgment was vacated in light of *Patterson.* — U.S. —, 109 S.Ct. 3207, 106 L.Ed.2d 558 (1989).

Hence, it accomplishes little to cite, *in finitum,* cases in which the courts have, or have not, adhered to *stare decisis.* I readily acknowledge that there are times when the doctrine should not be applied, even in instances of statutory construction—but only when the *Patterson* "special justification" test is met. In the Supreme Court cases noted by the majority, "special justification" was shown. In *Monell v. Department of Social Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), and *Nye v. United States,* 313 U.S. 33, 61 S.Ct. 810, 85 L.Ed. 1172 (1941), the decision being overruled was recognized as a departure from past Supreme Court precedent. And in *Peyton v. Rowe,* 391 U.S. 54, 55, 88 S.Ct. 1549, 1550, 20 L.Ed.2d 426 (1968), the prior decision was found to represent "an indefensible barrier to prompt adjudication of constitutional claims in the federal courts." But here, neither the defendant nor the majority has pointed to a single "special justification" for overruling the longstanding precedent of *Vasquez.*

serve'" (quoting B. Cardozo, *The Growth of the Law* 120 (1924)), or where "'the rule of our circuit has commanded no following in other federal courts of appeals and has been much criticized by the commentators'" (quoting *Chappell & Co. v. Frankel*, 367 F.2d 197, 200–01 (2d Cir.1966)). *United States v. Cocke*, 399 F.2d 433, 448–49 (5th Cir.1968) (en banc) (Goldberg, J.), *cert. denied*, 394 U.S. 922, 89 S.Ct. 1187, 22 L.Ed.2d 455 (1969).[13]

But none of these conditions obtains here. As I have noted, *United States v. Vasquez* was well-founded upon the principle established by *Freed*. The rule which it created is by no means outdated. To the contrary, as automatic weapons become more and more prevalent among criminal elements,[14] the virtues of the *Vasquez* rule in potentially helping to fight this problem have become more, not less, apparent over time.

By all indications, the principle of *United States v. Vasquez* has proven quite workable, as well. To date, it has permitted effective enforcement of the Act without subjecting "innocent" persons to prosecution. Thus, under the *Patterson* analysis, I certainly cannot surmise that our prior decision has been "tested by experience [and] ... found to be inconsistent with the sense of justice or with the social welfare." 109 S.Ct. at 2371.

The majority's evident frustration is that it is wholly unable to identify any adverse experience in the years since *United States v. Vasquez* was decided. To the contrary, I can only conclude, as the Court did in *Vas-*

*quez v. Hillery*, that "the need for such a rule is as compelling today as it was at its inception." 474 U.S. at 266, 106 S.Ct. at 625. And we are reminded that "it is better the law should be certain, than that every Judge should speculate upon improvements...." *Sheddon v. Goodrich*, 32 Eng.Rep. 441, 447 (Ch. 1803). If the rule is to be changed at this point, it should be for the Supreme Court or Congress to do so.

The court today too lightly dispenses with the principle of *stare decisis* for the sake of a danger that is wholly speculative. I respectfully dissent.

---

**13.** *See Helvering v. Hallock*, 309 U.S. 106, 119, 60 S.Ct. 444, 451, 84 L.Ed. 604 (1940) (Frankfurter, J.). The test for overruling precedent has been stated variously. E.g., "'[A] justice should consider overturning a prior decision only when the decision is clearly wrong, has significant effects, and would otherwise be difficult to remedy.'" Monaghan, *Stare Decisis and Constitutional Adjudication*, 88 Colum.L.Rev. 723, 762 (1988) (quoting Wallace, *Whose Constitution?*, in *Still the Law of the Land?* 10 (C. Roche ed. 1987)). "If the original reasons for the rule have disappeared or weakened, the rule has been persuasively criticized by judges and commentators, and practical experience suggests that the statutory goals are being undermined by the existing rule and can be better served by

a new rule, the precedent should be overruled unless there has been substantial legislative or private reliance on the rule." Eskridge, *supra* note 9, at 1364. *But see* 1B J. Moore, J. Lucas & T. Currier, *Moore's Federal Practice* ¶ 0.0402[5] at 101–02 (2d ed. 1988): "[A] rule provided by statute ... is not to be rejected because the passage of time and affairs lead the court to believe that the rule was improvident and should be changed.... [I]n the case of statutory interpretation Blackstone will simply not completely disappear."

**14.** *See, e.g.* "Epidemic in Urban Hospitals: Wounds from Assault Rifles," New York Times, Feb. 21, 1989, at 1.